Charles D. COLEMAN, Appellant,

v.

UNITED STATES of America.

No. 22129.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 22, 1970.

Decided March 8, 1971.

■■■■■■■■■■
■■■■■■

Mr. Warren E. Magee, Washington, D. C. (appointed by this court) for appellant.

Mr. Robert C. Crimmins, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. Messrs. David G. Bress, U. S. Atty., at the time the record was filed, and Frank Q. Nebeker, Asst. U. S. Atty., at the time the record was filed, also entered appearances for appellee.

Before BAZELON, Chief Judge, and McGOWAN and ROBINSON, Circuit Judges.

PER CURIAM:

Appellant, convicted by a jury of robbery, was given a sentence of one to three years, to run consecutively to a sentence he was then serving in Maryland. Two sources of error are claimed here. The first lies in the District Court's denial of appellant's motion for acquittal based on the insufficiency of the Government's proof. The second concerns the denial of appellant's motion to dismiss the indictment for want of a speedy trial. As to the first of these points, we think that after examining the evidence of record, the issue of guilt was properly submitted to the jury. In any event, the second claim we believe to be well taken; and, accordingly, we explore it hereinafter in some detail.

The offense occurred on July 1, 1966, and appellant was arrested within a few minutes thereafter. The victim, a re-tired employee of the National Bureau of Standards named Babb, testified that he went to the bank around noon and withdrew $3800. Of this amount, $1300 was placed in one wallet and $2500 in another. With both wallets in a deep shirt pocket, Mr. Babb boarded a bus at 6th and E Streets, N.E. Two blocks later, as the bus pulled up to a stop at an intersection, a passenger brushed against Babb and pulled the wallets from his pocket. Babb grabbed the blue suit jacket of the thief but could not hold on.[1] Both emerged on the sidewalk, the thief running and Babb in pursuit but losing ground rapidly. One Valentine, a District guard and cab driver, observed this chase as it went by his car which was stopped for a red light at the same intersection. Noting that Babb, who was shouting and gesticulating wildly, was falling behind, Valentine quickly applied his emergency brake and took up the chase on foot. Valentine testified that as the thief ran past his car he observed him carefully, noting his clothing, his Afro haircut, his eyes, and other facial features. Both pursuers lost contact when the thief ran into a residential alley, but two young boys playing in the vicinity pointed out the direction he had gone.[2] Since Valentine knew where the alley came out on the other side, he returned to his car and drove quickly around to that point.

After several minutes, appellant emerged. He stood at the entrance to the alley for a time and then turned and walked casually past Valentine's parked car and down an adjoining street. While appellant was standing in front of the local Safeway store, Valentine interrupted his surveillance to search for a police officer to assist in the arrest. Upon

---

1. Babb testified that the thief was wearing a blue suit with long trousers matching the jacket.

2. Both Babb and Valentine attempted to recount at trial their conversations with the two children but the judge interrupted their testimony each time. Apparently he sought to exclude all references to those conversations as hearsay, despite the fail-ure of either party to object. At any rate, the judge did permit both witnesses to state what action they took as a result of the encounter with the boys. Their responses clearly reflect that the boys pointed the direction the thief had taken. Valentine, at the close of the direct examination, did state without objection from the bench, "two children playing * * * said, 'He went that way.'"

finding an officer and returning to the street, they found appellant leaning against a fence at a nearby bus stop. Valentine was strongly positive in his testimony that appellant was the same man he had chased into the alley. The only difference in appearance between appellant and the thief who entered the alley, so he testified, was that, instead of blue trousers, appellant was wearing Bermuda shorts. Valentine testified that he thought to himself at the time, "That don't change me; I still know him."

One prosecution witness who lived on the alley in question testified that she heard someone run upstairs past her apartment and then down again shortly thereafter. Another witness who lived upstairs from the first testified that she found Babb's wallets on the second floor ledge. One wallet had $1300 in it but the other was empty. A defense witness, a female acquaintance of appellant, testified that she had seen him earlier on the morning in question wearing shorts. Appellant did not testify in his own defense, allegedly because he would have to implicate a friend as the robber.[3]

The serious question before this court concerns the alleged deprivation of appellant's Sixth Amendment right to a speedy trial. The Government's position throughout has been that appellant is so clearly guilty of this robbery that irrespective of the length or causes of the delay, he could have suffered no prejudicial deprivation of his constitutional right. We will in due course examine the

Government's contention more closely, but it will be helpful first to place appellant's claim in context. The following timetable of events from arrest to trial emerges from the record.

Arrested on July 1, 1966, appellant was released on bond the following day after a preliminary hearing in the Court of General Sessions. An indictment was returned on August 15. In the interim, on July 28, 1966, appellant was arrested for shoplifting in Maryland. On December 21 he was convicted of that charge and sentenced to three years in the Maryland House of Corrections, to which he was committed on December 22. His criminal jacket contains a letter, dated October 25, 1966, from the Sheriff of Prince George's County, Maryland, to the D.C. authorities, reporting appellant's detention in the county jail pursuant to his arrest. On January 18, 1967, appellant's bond was forfeited and a bench warrant was issued by the District of Columbia District Court. On January 26, the warrant was sent to the Maryland House of Corrections, and four days later a detainer was formally lodged.

Some ten months later, by a letter to the United States Attorney, dated December 2, 1967, appellant requested that he be brought to trial for the D.C. robbery charge pending against him. Several weeks thereafter, on January 19, 1968, the United States Attorney filed a writ of *habeas corpus ad prosequendum* which was granted by the Maryland correctional authorities. Appellant was then

---

3. The "friend" whom appellant indicated he would implicate was a Mr. Singleton who was subpoenaed to testify on behalf of the defense. The judge, upon learning that Singleton's testimony might be self-incriminatory, delayed his appearance in order that counsel from the Legal Aid Society could be appointed to represent him. There was also an extended bench conference at which, after the judge instructed appellant personally about his right to remain silent, appellant stated that he had finally decided not to take the stand. His attorney stated that his client's decision was against his advice:

"COUNSEL: Your Honor, * * * its my recommendation that he take the

stand but * * * he prefers not to take the stand.

"COURT: I didn't understand.

"COUNSEL: His acquaintance of this young man [Singleton], your Honor. Realizing if he takes the stand * * * he would have to implicate another person in the offense and he prefers not to do this."

After talking again to appellant, the judge adjourned the court for the day in order that appellant could reconsider his decision. On the following day appellant again stated that he was determined not to testify. Ultimately, then, neither appellant nor Singleton testified.

returned to the D.C. jail. He was arraigned on February 23; counsel was appointed on the 26th; and a motion to dismiss for lack of speedy trial was made on March 18. At the April 5th hearing before the District Court, the motion was denied.

■ The total time elapsing between arrest[4] and the dismissal hearing was 626 days, or approximately 21 months. A delay of this length by itself raises a serious speedy trial question. At the least, it places on the Government the heavy burden of demonstrating that appellant's Sixth Amendment right has not been abridged. Hedgepeth v. United States, 124 U.S.App.D.C. 291, 294, 364 F.2d 684, 687 (1966). In exploring this speedy trial issue, we must consider in addition to the durational factor, "the reasons for the delay, the diligence vel non of prosecutor, court, and defense counsel, and the likelihood, or at least reasonable possibility, that defendant has been prejudiced by the delay." Hedgepeth v. United States, *supra*. *See also* Dickey v. Florida, 398 U.S. 30, 48, 90 S. Ct. 1564, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring).

Unlike so many of the speedy trial cases reviewed by this court in recent years, this is not a case in which we are called on, after hearing appellant's and the prosecutor's competing claims, to attempt to parcel out the blame for each of the discrete dilatory occurrences which, taken together, have raised the specter of constitutional violation.[5] Here we are not asked to ascertain what portion of the 21-month delay is properly attributable to the Government and what percentage to the accused.[6] Nor is this a case in which we can allocate any substantial portion of the delay [7] to "the deliberate pace of the system of safeguards designed to protect the accused." Blunt v. United States, 131 U.S.App.D.C. at 310, 404 F.2d at 1287; United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). Indeed, the Government, upon whom the burden of explanation lies, has failed to offer, either at the dismissal hearing or in its brief on appeal, any justification for the unusually lengthy interval between arrest and trial.

Appellant alleges, and our examination confirms, that the major cause of the delay here arose from appellant's incarceration in Maryland which began only 26 days after his preliminary hearing. Although the Government knew of his presence there at least as early as October, 1966 (when the Prince George's County Sheriff informed the District authorities of appellant's whereabouts), no effort was made to secure his return for trial until January, 1968. Apparently, appellant's letter to the United States Attorney requesting trial was the impetus for the Government's eventual seeking of the appropriate writ of *habeas*

4. It is the consistent practice in this jurisdiction to compute the length of delay from the date of *arrest* rather than from some later stage in the proceedings. *See, e. g.,* Hardy v. United States, 119 U.S. App.D.C. 364, 343 F.2d 233 (1964); United States v. Reed, 285 F.Supp. 738 (D.D.C. 1968).

5. *See, e. g.,* Blunt v. United States, 131 U.S.App.D.C. 306, 309, 404 F.2d 1283, 1286 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 21 L.Ed.2d 221 (1969); Harling v. United States, 130 U.S.App. D.C. 327, 329–330, 401 F.2d 392, 394– 395 (1968), cert. denied, 393 U.S. 1068, 89 S.Ct. 725, 21 L.Ed.2d 711 (1969).

6. It is not urged here that appellant waived his speedy trial right by leaving the juris-

diction nor do we think such an argument could be made consistently with the Constitution. *See* Note, Effective Guaranty of a Speedy Trial for Convicts in Other Jurisdictions, 77 Yale L.J. 767, 772 (1968). This circuit has rejected the similar claim that delay is attributable to the accused since his own unlawful conduct caused his incarceration outside the District. *See, e. g.,* United States v. Reed, 285 F.Supp. 738, 740 (D.D.C. 1968).

7. Defense counsel, after his appointment by the court, did require a period of 21 days for preparation and investigation. This much time is far from unreasonable and did not substantially contribute to the total delay.

*corpus ad prosequendum.* But for appellant's request, there is no indication that the Government intended to move toward prosecution until the culmination of appellant's three-year Maryland sentence.

The Supreme Court, faced with speedy trial claims in which the accused was incarcerated outside the prosecuting jurisdiction for another crime, has recently taken a dim view of governmental unwillingness to press for expeditious prosecution of such defendants. Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed. 2d 26 (1970); Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). The Court has emphasized that the basic protections afforded by a speedy trial— prevention of undue and oppressive incarceration prior to trial, minimization of anxiety and concern associated with public accusation, and limitation of the possibility that delay will impair the accused's ability to defend himself [8]—are equally, if not more, significant where the accused is imprisoned in another jurisdiction prior to trial. Smith v. Hooey, *supra,* at 378, 89 S.Ct. 575.

Among the aggravating effects discussed by the Court are the following. The duration of imprisonment in the incarcerating jurisdiction may be increased since the pendency of an outstanding charge against the accused may render him ineligible for clemency, parole, or conditional pardon. Additionally, the prospect of eventual reincarceration may interfere with the prisoner's desire to participate in the rehabilitory programs offered by the correctional institution.

At the least, there can be little doubt that, as the Court has stated, "an outstanding untried charge * * * can have fully as depressive an effect upon a prisoner as upon a person who is at large." Smith v. Hooey, *supra,* at 379, 89 S.Ct. at 577. Of course it must also be apparent that the imprisoned person is more severely disadvantaged in the preparation and preservation of his defense than is the defendant who is free on bond.[9]

Despite recognition of the harmful impact that delays in prosecution may have on individuals who are imprisoned for another crime while awaiting trial, there remains some disagreement whether the burden lies with the prosecutor or the accused to mitigate the hardship by pressing for a speedy trial.[10] Those favoring the argument that the initial responsibility to demand a speedy trial lies with the accused, reason that he may well conclude that a stale Government case is to his benefit. He might even have reason to hope the Government will eventually dismiss the indictment on its own motion. For these reasons, so the argument goes, in the absence of a demand it will be assumed that the accused consented to the delay.[11] Those who disagree with this approach contend that the responsibility to prosecute lies with the prosecutor, not the accused. The demand rule is also criticized as inconsistent with the doctrine that courts will indulge every reasonable presumption against the waiver of constitutional rights. See Dickey v. Florida, *supra,* 398 U.S. at 48–50, 90 S.Ct. 1564.[12]

8. *See* United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

9. The courts of this circuit have long been sensitive to the problems of prosecution of persons incarcerated outside the District of Columbia. *See* Taylor v. United States, 99 U.S.App.D.C. 183, 238 F.2d 259 (1956); United States v. Reed, 285 F.Supp. 738 (D.D.C. 1968).

10. The following articles offer good discussions of the demand problem and analysis of the leading cases from the federal circuits: Note, The Right to a Speedy Trial, 20 Stan.L.Rev. 476, 478–480

(1968); Note, The Right to a Speedy Criminal Trial, 57 Colum.L.Rev. 846, 852–855 (1957).

11. *See, e. g.,* United States ex rel Von Cseh v. Fay, 313 F.2d 620, 623 (2d Cir. 1963); Collins v. United States, 157 F.2d 409, 410 (9th Cir. 1946).

12. *Both Smith* v. *Hooey* and *Dickey* were cases in which the accused had made numerous demands to be tried and, therefore, the Court was only called on to decide what the prosecutors' obligations were upon such a demand. As pointed out by Justice Brennan in his concurring

Here, the judge presiding at the hearing on dismissal for lack of a speedy trial seemed to be of the opinion that appellant's failure to demand to be tried at an earlier date constituted a waiver of his Sixth Amendment right.[13] Whatever the contours of the demand rule, we cannot agree on the basis of this record that appellant's inaction now robs his claim of merit. The trial judge based his decision on the premise that appellant was represented by counsel while he was in Maryland and, therefore, any decision appellant made was one arrived at intelligently with professional advice. Over appellant's strenuous assertion that he was *not* represented by counsel at that time, the court reasoned that, since counsel was provided at the preliminary hearing in the Court of General Sessions, that same attorney must have continued to represent him at all pertinent times thereafter. Although such continuous representation is mandated by the Criminal Justice Act,[14] we are familiar with those shortcomings in the practical operation of the statute alleged by defense counsel in his colloquy with the judge in this case:

"Counsel: Now, I think that the Court would have to take judicial notice of the fact that once counsel does two things [in General Sessions Court] —and that is, holds a preliminary hearing and sees that the defendant is out on bond—as a practical matter, counsel over there think of themselves as being out of the case.

"The Court: They are not out.

"Counsel: Well, as a practical matter, they do not follow the case up any further, and, if necessary, I would be glad to have [the appointed counsel] come in and say that he in fact did not make any effort to represent the man after doing what is normally thought to be the full extent of his duties. * * * *"

At no point in the proceeding did the Government challenge this assertion. This court has spoken before of the inadequacy of post-preliminary hearing representation by court-appointed counsel, and we have no reason to doubt defense counsel's characterization of the situation in the Court of General Sessions at that time. *See* Smith v. United States, 135 U.S.App.D.C. 284, 289, 418 F.2d 1120, 1125 (1969) (Wright, J., dissenting); Williams v. United States, 129 U.S.App.D.C. 332, 336, 394 F.2d 957, 961 (1968).

Insofar as the court's finding of waiver was based on the assumption that appellant acted upon, or with meaningful access to, the advice of counsel, it was in error. And, without counsel, we have no basis for assuming that appellant had either the ability or the information [15] on which to make an intelligent and voluntary waiver of his right to a speedy

---

opinion in *Dickey*, those cases cannot be read as deciding that the defendant "is not entitled to a speedy trial unless he demands it at the time of the delay." Dickey v. Florida, *supra*, at 40, 90 S.Ct. at 1570.

13. Although the judge did not deny the motion specifically on grounds of waiver, his statements during the hearing clearly indicate the central role the demand rule played in his consideration of the motion.
"I don't think you can say it is the Government's duty to always go forward first. He has got some duties to protect himself. He can't just sit around and wait it out."
Elsewhere in the transcript from that hearing the judge said:

"[Appellant] wrote a letter last December. That is all he did. Meanwhile, he is incarcerated and a detainer is filed against him."

14. "A defendant for whom counsel is appointed shall be represented at every stage of the proceedings from his initial appearance before the United States magistrate or court through appeal."
18 U.S.C. § 3006A(c) (Supp. V, 1970).

15. *See, e. g.*, Pitts v. State of North Carolina, 395 F.2d 182, 187 (4th Cir. 1968); United States v. Reed, 285 F.Supp. 738, 741 (D.D.C. 1968) ("Clearly there can be no waiver of the right to a speedy trial where * * * [the defendant] is powerless to assert his right because of imprisonment, ignorance and lack of legal advice.").

trial.[16] Furthermore, we think that by its failure to offer any explanation or justification for the delay, the Government has tacitly assumed full responsibility for it here.[17]

The Government rests its case on appeal solely on the issue of possible prejudice to the accused. Its single position is that the evidence of guilt is so *overwhelming* as to negate any inference of prejudice to appellant in the preparation of his defense. *See* Harling v. United States, 130 U.S.App.D.C. 327, 330–331, 401 F.2d 392, 395–396 (1968), cert. denied, 393 U.S. 1068, 89 S.Ct. 725, 21 L.Ed.2d 711 (1969) (While a "slight showing of possible prejudice * * * might have entitled defendant to relief * * *," here there was not "even a wisp of prejudice."); Taylor v. United States, 99 U.S.App.D.C. 183, 186, 238 F.2d 259, 262 (1956) (The case against appellant was "weak." Had it been "overwhelming," a different result might have been reached.).

In its brief, the Government's review of the facts demonstrates that its confidence in the guilt of the accused depends almost entirely on the testimony of Mr. Valentine. It is his assertion— that appellant was the same man whom he had chased into the alley—that provides the foundation for the prosecution's case. While we are satisfied that his testimony was sufficient to send this case to the jury, we are not so sanguine as is the Government that it demon-strates guilt so unequivocally that no occasion for prejudice due to the lengthy delay could have arisen.

Of course, the Government is correct in pointing out that all the critical evidence in this case goes to the question whether the man who emerged from the alley was the same man who went in several minutes before. In alleging prejudice, it is the evidence on precisely this question that appellant attacks. At the dismissal hearing, appellant's counsel pointed out that,

> "[t]here is an allusion in the United States Attorney's file to two young boys who pointed out the direction in which the robber fled in this case and, apparently, got a good look at him. Later on when the defendant was arrested and brought to the scene where the wallets were found, there were two boys who were around there who the defendant says said, 'This is not the guy that we saw run through the alley.' We don't know who those boys were. We have made every effort to find them but to no avail. I think there might have been a possibility of finding them. * * *"

The judge rejected this contention of prejudice for the very reason we have already found unimpressive, namely, that appellant was represented by counsel while out on bond for 26 days following the preliminary hearing and, therefore, any prejudice resulting from the disappearance of the two boys was attribut-

---

16. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Our conclusion on this point is not a rejection of the procedure suggested by the American Bar Association in its Standards Relating to Speedy Trial. Under these standards, if the accused is serving a term of imprisonment, the prosecutor has the option either to undertake to obtain the prisoner's immediate presence for trial or to "cause a detainer to be filed with the official having custody of the prisoner and request him to so advise the prisoner and to advise the prisoner of his right to demand trial." ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Speedy Trial § 3.1(a) (Approved Draft, 1968). On this record, however, we have no basis for applying such a rule since the Government has failed to show that appellant was properly notified and advised of his right to demand trial.

17. We note in passing that recently the Second Circuit has, in promulgating supervisory rules regarding speedy trial, rejected altogether the demand rule. Second Circuit Rules Regarding Prompt Disposition of Criminal Cases, Rule 8 (Jan. 5, 1971). These rules also reject the ABA's suggestion regarding the use of detainers (*see* Note 16 *supra*). Rule 5(f) requires the prosecutor to seek expeditious prosecution of defendants incarcerated in other jurisdictions in every case.

able to appellant's failure to locate them during that time. Again, appellant's trial counsel repeatedly contended that his client was without counsel during that period and the Government nowhere contradicts that claim. Our experience with the practical functioning of the Criminal Justice Act in respect of initial presentments in General Sessions Court makes such lack of counsel not unlikely.[18]

Certainly the record gives us reason to believe that the testimony of these two boys would have been crucial. There is also ample corroboration in the record showing that appellant's reference to the two boys was not fanciful. Both Babb and Valentine testified at the preliminary hearing, and again at trial, that two boys did see the thief and pointed in the direction he had fled. Officer Lamb's testimony about what occurred when he took appellant back to the same

alley on the day of the crime is also consistent with appellant's account. Although he did not testify that he overheard the conversation appellant alleges occurred at that time, he did indicate its possibility since he testified that a large number of children were gathered around the police car in which appellant sat.[19]

Even without the testimony of the two boys,[20] we might be compelled to agree with the Government that its case is overwhelming if it were not for several other troublesome items that appear in the record. First, Officer Bell, one of the investigating officers, testified that no thorough effort was ever made to find the trousers appellant allegedly shed in the alley. Such an investigation, the Government alleges, was said to be precluded because of "dogs in the neighborhood." In a similar vein, Officer Bell testified at the preliminary hearing

18. The trial judge was also of the opinion that even without counsel the burden was on appellant to search for those boys on his own. An innocent man, the judge reasoned, would have searched unceasingly for those whose testimony could clear him. First, we are not at all certain that appellant, at that point in time, should have foreseen the critical impact the two boys would have on his case. Second, if appellant was "covering" for a friend as he alleges (see Note 3 supra), the decision whether to bring in the boys who could implicate his friend would have been a difficult decision—much like the decision whether to testify at trial—requiring professional advice. We must also note that appellant cannot be assumed to have known on July 2, 1966 that he would have only 26 days to find his witnesses. Under these circumstances we cannot confidently determine whether the failure to act is indicative of guilt, ambivalence, a misplaced protective motive, or procrastination. Certainly it is not so clear as to deprive his claim of prejudice of all merit.

19. After trial counsel was appointed on February 26, 1968, the court approved an order allowing appellant and his attorney to return to the neighborhood to search for the boys. Their search at this late date proved unfruitful.

20. In our consideration of the question of prejudice we have disregarded an affidavit by appellant's trial counsel which was attached to his appellate brief (he was represented by different counsel on appeal). That affidavit purports to list all the items of testimony that trial counsel "attempted to proffer [at the dismissal hearing] to show that the defendant had been prejudiced by the governmental delay. * * *" The affidavit indicates that counsel contemplated calling four or five persons to testify. The hearing judge asked counsel whether there was any need for an evidentiary hearing on the motions—either the motion to suppress the identification or the speedy trial motion—or whether they might "take it on argument." Counsel for appellant stated that he would have no objection to proceedings without an evidentiary hearing on the speedy trial issue but preferred not to proceed on the identification point. We think counsel is now precluded from contending that the testimony should have been heard.

Nor can we agree with the assertion in appellant's brief that the judge "cut off the argument * * * on the motion to dismiss." Counsel's statements during the hearing are inconsistent with this claim. After making his proffer regarding the two boys, a lengthy discussion ensued between the judge and defense counsel, at the conclusion of which the latter said, "If you don't agree with me, there is nothing that I can do to convince Your Honor. I have made my argument, so I rest my case."

that the wallets were not dusted for fingerprints because he concluded that too many hands had already touched them. It is at least disappointing that no effort was made to discern in a laboratory whether one or more of the thief's prints might have shown through. Proof of either the trousers or the prints would have gone far in solidifying the prosecution's case. While we would not rest reversal on such weaknesses in the Government's investigation, we do find in them fair rebuttal to the claim of overwhelming proof of guilt.

We are also disturbed by Babb's inability, in contrast to Valentine, to make a positive identification of appellant as the thief. He failed to pick him out of a lineup staged on the day of the robbery.[21] On the day of trial, during the voir dire hearing on identification, the complainant, when asked to make an in-court identification, left the stand, walked over to where appellant was seated, looked at him closely, and said, "I can't say for sure." At this point the Government indicated that it did not intend to have Babb make an identification before the jury and the hearing was concluded.[22]

■ These circumstances taken together compel us to reject the argument that this 21-month delay could have in no way prejudiced appellant in the preparation of his defense. Indeed, even if we were to have found merit in the Government's overwhelming-proof-of-guilt contention, our inquiry in this case would not have been concluded. The question of deprivation of the accused's right to a speedy trial requires consideration of several factors, not one.[23] Such factors as the length of the delay, and the total lack of justification offered by the Government (especially in light of the considerations raised by the Supreme Court in *Smith* and *Dickey* regarding the possibly harmful effects in the treatment of the incarcerated accused), might well have suggested the necessity of reversal despite the lack of a specific finding that appellant was hampered in preparing his defense.[24] This case does not present, however, so difficult a question. We find that appellant's conviction should be reversed and his indictment dismissed.

It is so ordered.

---

21. Babb, the complainant, did make an identification shortly after the lineup. He saw appellant with a policeman walking down a corridor at the stationhouse. A few moments later he identified appellant sitting in one of the rooms. Had the Government sought to use an in-court identification, this meeting would have raised serious questions of suggestiveness and independent source.

22. Furthermore, even in Valentine's testimony we find cause to discount the claimed overpowering persuasiveness of the Government's case. First, we note that, much like Babb, Valentine had only a fleeting opportunity to observe the thief's physical characteristics as he darted past his car. Yet, unlike Babb, his testimony is that he was able to recall minute details about appellant's facial features. This raises the possibility that such a detailed identification is due to his much more extensive observation of appellant when he emerged from the alley.

Second, Valentine's description of appellant's conduct when he came out from the alley—casually walking down the street and stopping several times—does not seem consistent with what one would expect of a fleeing thief. Again, these are issues for a jury's consideration and we would not be reviewing them now but for the Government's sole reliance on the strength of its case to rebut any "wisp" of prejudice.

23. *See* Beavers v. Haubert, 198 U.S. 77, 87, 25 S.Ct. 573, 49 L.Ed. 950 (1904); Hedgepeth v. United States, 124 U.S. App.D.C. 291, 294, 364 F.2d 684, 687 (1966).

24. Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), intimates that, at least in cases of unexplained and unnecessary delay, no showing of prejudice to the defendant in the preparation of his defense may be required. *See* Note, 77 Yale L.J. at 769, *supra* Note 6.