Carl M. REED, Appellant,

v.

UNITED STATES, Appellee.

No. 10914.

District of Columbia Court of Appeals.

Argued March 8, 1977.

Decided Feb. 6, 1978.

NEBEKER, Associate Judge:

On appeal from convictions of robbery, D.C.Code 1973, § 22–2901, and assault with intent to rob, D.C.Code 1973, § 22–501, appellant asserts as error: (1) the denial of a motion to dismiss the indictment for lack of a speedy trial; (2) the refusal to give an instruction on permissible adverse inference to be drawn from inability to produce police notes made at the scene; (3) the denial of a motion to compel discovery of certain information pertaining to members of the grand jury; (4) the giving of an anti-deadlock "*Winters*"[1] charge; and (5) the admission of certain items into evidence. We affirm.

The circumstances leading to appellant's arrest and conviction were as follows. Hiawatha Barber was escorting Quinzella Jackson to his car on the evening of December 14, 1974, when they noticed three men across the street from them. One of the men particularly stood out because he was wearing an off-white "superfly suit" with a white large brim "gangster hat." As the couple approached Barber's car, the three men surrounded them. Appellant, wearing the superfly outfit, put a gun to Barber's head while his accomplices took Jackson's purse. Nothing further was taken because the approach of a neighbor frightened the perpetrators away.

Police responded soon thereafter and, as Barber gave a description of the perpetrators to two officers, one of them broadcast the description over the police radio while the other made notes on a piece of paper. Shortly after the broadcast, another officer observed three males, matching the descriptions radioed, near the parking lot of a restaurant. The three men entered the restaurant and the officer called for back-up units to respond to the scene. The three men emerged from the restaurant almost immediately and were apprehended. A search of the immediate area produced a revolver. One of the officers spoke with the doorman of the restaurant and, as a result of the conversation, went into the men's room and found a wallet in a flush tank. The wallet was later identified by

Richard Seldin, Washington, D. C., appointed by this court, for appellant.

Iraline G. Barnes, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William D. Pease, and Mark H. Tuohey, III, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, NEBEKER and HARRIS, Associate Judges.

1. *Winters v. United States*, D.C.App., 317 A.2d 530 (1974) (en banc).

Jackson as her stolen wallet. The three men were returned to the scene of the crime and two of them were identified by Barber as the perpetrators. Jackson noted that the coat which appellant was wearing resembled that of one of the robbers. After transportation of appellant to the police station, a routine check under the car seat on which appellant had sat produced a set of keys which Jackson later identified as hers.

## I. SPEEDY TRIAL

The speedy trial issue in this case arose as follows. After Reed's arrest on December 14, 1974, a preliminary hearing was held on January 23, 1975. An indictment was returned on February 20, 1975, and Reed was arraigned before Judge Alexander on March 4, 1975. Trial was set for May 13, 1975, and appellant was continued on his original bond. Following the arraignment, counsel for Reed filed a Motion to Suppress Identification, a Motion to Compel Discovery and Dismiss the Indictment, and a Motion to Suppress Evidence. On May 13, 1975, Judge Alexander heard argument on the motion to compel discovery and dismiss the indictment, took the motion under advisement, and continued the case until July 17, 1975.

On July 17, 1975, Judge Alexander was in trial on another matter and the case therefore was continued until December 11, 1975. During this interval, the felony judge assignments changed, and the case was transferred to Judge Doyle. On December 11, 1975, with the parties present, Judge Doyle set the trial date for February 10, 1976. Appellant had earlier filed a Motion for Severance on December 11, 1975. On February 10, 1976, the case was called but could not be heard since the motion to dismiss was still under advisement by Judge Alexander. At this time, appellant's counsel made an oral motion to dismiss for lack of a speedy trial and on February 20, 1976, a written motion to that effect was filed. The original motion to dismiss the indictment was subsequently denied on March 11, 1976, ten months after submission. On March 12, 1976, the speedy trial motion was argued and denied.

Trial commenced three days later and fifteen months after arrest, and, after verdict, appellant was sentenced to a term of five to fifteen years on the robbery count and two to six years on the assault with intent to commit robbery count, the sentences to run consecutively.

While the right to a speedy trial is constitutionally mandated, it has been historically an ad hoc decision after the balancing of relevant factors including societal interests in the deterrence and punishment of crime. The Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), recognized these opposing values and adopted the now familiar balancing test which requires consideration of four factors: (1) length of delay; (2) reason for delay; (3) time of assertion of the right; and (4) prejudice through delay to the defendant. *Id.* at 530–32, 92 S.Ct. 2182. Our examination of the record convinces us that appellant's motion was properly denied.

Although a period of fifteen months elapsed between appellant's arrest and the commencement of his trial, there is "no constitutional basis for holding that the speedy trial right can be quantified into a specific number of days or months." *Barker v. Wingo, supra* at 523, 92 S.Ct. at 2188. Several cases in this jurisdiction have rejected speedy trial claims despite pretrial delays that were equal to or greater than that in the instant case. *See, e. g., United States v. Calhoun*, D.C.App., 363 A.2d 277, 278 (1976); *Riley v. United States*, D.C. App., 291 A.2d 190 (1972); *United States v. Sarvis*, 173 U.S.App.D.C. 228, 523 F.2d 1177 (1975); *United States v. Rosenbloom*, 167 U.S.App.D.C. 211, 511 F.2d 777 (1974); *United States v. Jones*, 154 U.S.App.D.C. 211, 475 F.2d 322 (1972). Thus, time lapse alone is only a touchstone calling for a balancing of all other factors. *Hedgepeth v. United States*, 124 U.S.App.D.C. 291, 294, 364 F.2d 684, 687 (1966). While this court has followed the United States Court of Appeals for the District of Columbia Circuit in *Hedgepeth v. United States, supra* at

293, 364 F.2d at 686, by observing that a delay of more than one year is prima facie reflection of merit to a claimed denial of the right to a speedy trial, it is important to note that delay alone has never been conclusive except in cases like *In re Provoo*, 17 F.R.D. 183 (D.Md.), *aff'd per curiam*, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955) —a case of many years' delay. Indeed, it is quite apparent that the one-year delay period is a simple rule of thumb reasonably to avoid the time consuming necessity of record analysis in most cases of delay under one year. Affording, prima facie effect to delay of one year or more simply triggers review of the record for a balancing of all relevant factors. That is precisely what the court said and did in *Hedgepeth*. In view of the one-year delay, it said, "[W]e undertake a review of the intervening events." *Id.*, 124 U.S.App.D.C. at 293, 364 F.2d at 686. It attached no "evidentiary" presumption to the delay, but simply observed that time being "the most important" and review-triggering factor, the longer the delay "the heavier the burden of the Government in *arguing*" that the speedy trial right has not been denied. *Id.* at 294, 364 F.2d at 687 (emphasis supplied).

■ In assessing the weight to be given to the length of the delay, an inquiry into the reasons for the delay is also mandated, *Barker v. Wingo, supra*, 407 U.S. at 530, 92 S.Ct. 2182. Although negligence and docket congestion are to be viewed as right-denying factors, neither is given as much weight as deliberate prosecutorial delay. *Id.; accord, Moore v. United States*, D.C. App., 359 A.2d 299 (1976); *United States v. Lara*, 172 U.S.App.D.C. 60, 520 F.2d 460 (1975); *United States v. Bishton*, 150 U.S. App.D.C. 51, 463 F.2d 887 (1972).

■ In the case at hand, no contention has been made that the prosecution was deliberately trying to delay the commence-

ment of appellant's trial for tactical advantage. *Compare Branch v. United States*, D.C.App., 372 A.2d 998 (1977). Although appellant states that on several occasions the government was not ready to proceed, our reading of the record shows that in each instance the case was continued due to a failure on the part of the trial court to decide the initial motion to dismiss the indictment, or due to the overcrowded docket. Therefore, the most that is available to appellant is an argument respecting the failure of Judge Alexander to expedite disposition of the motion. *See United States v. Jones*, D.C.App., 254 A.2d 412, 414 (1969); *United States v. Kennedy*, D.C.App., 220 A.2d 322, 324 (1966); *United States v. Sarvis, supra.* It is also significant that the prosecution filed a motion to render a decision.[2]

In *Barker*, the Supreme Court held that a defendant's assertion of his speedy trial right is entitled to "strong evidentiary weight" and "that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker v. Wingo, supra*, 407 U.S. at 531–32, 92 S.Ct. at 2193. *See also Bond v. United States*, D.C.App., 233 A.2d 506, 512–13 (1967). While appellant's counsel objected to the continuances of July 17, 1975, and December 11, 1975, a motion to dismiss for lack of speedy trial was not made until February 20, 1976, 14 months after arrest.[3] Thus, the earlier delay cannot be viewed as occurring in the face of a speedy trial demand and is accorded less significance than if appellant had raised the speedy trial issue at an earlier date. *See United States v. Jones*, 173 U.S.App.D.C. 280, 297, 524 F.2d 834, 851 (1975). Of course, acquiescence in delay by not objecting to it will result in minimal weight being accorded to that period.

---

2. Although no such motion is contained in the record before this court, unquestionably one was filed since the appellant filed a response to a Motion to Render a Decision and that pleading is before us.

3. *See United States v. Brown*, 172 U.S.App. D.C. 92, 93, 520 F.2d 1106, 1107 (1975), where it was said, "In computing the time lag before trial we think the starting point is the date of the arrest . . . ." *Accord, Coleman v. United States*, 142 U.S.App.D.C. 402, 405, 442 F.2d 150, 153 (1971).

In assessing the prejudice caused by the delay, the Supreme Court has stressed three major considerations: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation of the possibility that the defense will be impaired. *Barker v. Wingo, supra,* 407 U.S. at 532, 92 S.Ct. 2182.

█ As to the first consideration, we note that the defendant was free on bond and was able to remain employed. Thus, he was free during the delay to consult with counsel and potential witnesses and to gather the evidence needed for his defense. As to the anxiety factor, appellant complains that he was unable to obtain a "better" job than the one he continued in because of his pending prosecution. We think this to be a tenuous argument at best since any one of a number of factors could have been the cause of absence of his advancement. Moreover, a mere assertion that one had been upset or concerned about a pending criminal prosecution is not sufficient. *See United States v. Jones, supra,* 173 U.S.App. D.C. at 298, 524 F.2d at 852.

Finally, on the issue of whether appellant's defense was impaired, he contends that he was unable to subpoena a former police officer who might have been able to provide information regarding destroyed notes. We find this argument to be without merit and agree that it is insufficient for a defendant merely to assert that a witness, now unavailable, might have been able to help the defense. *Robinson v. United States,* 148 U.S.App.D.C. 58, 65, 459 F.2d 847, 854 (1972). *See also United States v. Jones, supra,* 173 U.S.App.D.C. at 290, 524 F.2d at 844. Appellant has not offered any support for his assertion that the testimony of the police officer would have been beneficial to his case.

Appellant asserts that the identification testimony of one of the victims became less reliable due to the passage of time. This may be summarily dismissed. Since the burden of proof was upon the government and the witness in question testified for the prosecution, it cannot be argued that appel-

lant was prejudiced in this regard. In fact, if either party was prejudiced, it was the government.

## II. THE LOST NOTES

█ Arguing that the preservation of police notes for trial is essential to the implementation of the principles of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the provisions of the Jencks Act, 18 U.S.C. § 3500 (1970), appellant's next claim of error is the trial court's failure to give a requested "missing notes" instruction to the effect that the jury could infer that the notes would help the defense by impeachment of the speaking witness. Appellant had suggested that such an instruction be given as a variation of the theme in the "missing witness" instruction and Judge Leventhal's suggestion in *United States v. Bundy,* 153 U.S.App. D.C. 191, 472 F.2d 1266 (1972).

It is possible to decide this issue on the assumption that a "missing notes" instruction is founded in logic and we will undertake to do so. However, it is difficult to see how a reasonable doubt as to credibility—a doubt for which a reason exists, as the familiar jury instruction goes—can arise from the simple fact that a police officer later lost a statement of a witness. Absent demonstrable collusion, it is sheer speculation—not reasoned judgment—that a witness, usually in these cases a victim, is testifying untruthfully and that the later negligent or imprudent loss of records by the police prevents devastating disclosure of that fact by the accused. This debate on the point is nonetheless readily seen to emanate from dictum in *Bundy* and in *Jones v. United States,* D.C.App., 343 A.2d 346, 352 (1975).

The prosecutor was apparently not aware of the existence of any notes relating to a description of the perpetrators and, even on appeal, the government continues to contest whether in fact such notes were ever taken. The victim testified at trial that he gave his description to two police officers; one officer simultaneously broadcast the description over the police radio while the other

officer presumably made handwritten notes of the description. This being the only testimony on the possible existence of notes, the most that could be concluded is that the second officer was writing while the victim spoke. Whether what the officer was writing was a substantially verbatim statement of the victim's description is left to speculation, because there is no evidence as to the content of the writing. In contrast, the victim heard the repetition of his description as it was relayed over the police radio and his acquiescence therein can be interpreted as an adoption by the victim of the transmitted description. Significantly, the radioed description was transcribed and made available to appellant. Moreover, appellant was arrested on the basis of the radio lookout within minutes. Appellant then was returned to the scene and identified by one of the victims. It is thus apparent that, if in fact substantially verbatim notes were taken of the description, the same data were incorporated in the radio run, which was produced. Any differences between the two would reflect error in the notes more than in the transcript. Such incorporation into other produced documents is sufficient to exempt missing notes from Jencks and other types of sanctions, and avoid any possible prejudice to a defendant. *See Moore v. United States*, D.C. App., 353 A.2d 16, 19 (1976). As noted by Judge Leventhal in his concurring opinion in *United States v. Bundy, supra*, 153 U.S. App.D.C. at 194, 472 F.2d at 1269:

> In affirming this conviction, it is our premise that when rough notes are taken in a fast-moving street situation and incorporated into a simultaneous radio lookout, . . . there is indication of the reliability of the reporting process. . .

Accordingly, the trial court did not err in refusing this requested instruction.

## III. GRAND JUROR DISCOVERY

The next issue appellant raises concerns the refusal of the trial court to grant him discovery of the following information:

1. The names of the grand jurors who indicted [appellant];

2. The ages and occupations of such grand jurors;

3. Whether such grand jurors had relatives or friends who worked for any law enforcement organization;

4. Whether any such grand jurors had been arrested or convicted of any felony and/or misdemeanor and what sentences had been received, if any; [and]

5. The names of any such grand jurors who had been victims of any criminal activity; the nature of that activity; the effect of that activity upon the victim, *i. e.*, hospitalization, testimony in court; and whether any subjects had been apprehended, tried and convicted for such activity. [Brief for Appellant at 23.]

On April 11, 1975, appellant and the government, *inter alia*, stipulated to the following:

> In the District of Columbia defense counsel does not have an opportunity to *Voir Dire* grand jurors deliberating on counsel's particular matters;
>
> In the District of Columbia neither the Chief Judge, any other member of the judiciary, the United States Attorney's Office nor any other person conducts a particularized *Voir Dire* of the grand jurors as a whole or as individual grand juries [*sic*] for the purpose of ascertaining possible prejudice by eliciting the type of information mentioned with the exception of the material sought on the postcards sent out to all potential jurors.
>
> In the District of Columbia neither the United States Attorney's Office nor the Superior Court judicial or administrative organs provide defense counsel with the information sought, *supra*. . . .

Despite this acknowledgement of lack of precedent for access to the requested information, appellant assumes that contradictions exist between the purposes of the grand jury as reflected by the Constitution, and its current actual function. Accordingly he asserts, urgent measures are needed to reassert an accused's rights before the grand jury. He cites as foremost among such measures the opportunity for defense counsel to voir dire prospective grand jurors for their particular cases.

The issue appellant raises was definitively dealt with in *United States v. Knowles,* 147 F.Supp. 19, 20–22 (D.D.C.1957), where the court stated in part:

> The qualifications of grand jurors are fixed by law. . . . The accused may attack the legal qualifications of a grand juror, either by challenging an individual juror on the ground that the jury is not *legally* qualified, or by motion to dismiss the indictment because of a lack of legal qualifications of an individual juror. [Emphasis in original; footnotes omitted.]
>
> Challenges for bias, or for any cause other than lack of legal qualifications, are unknown as concerns grand jurors. No provision is made for peremptory challenges of grand jurors and no such challenges are permitted. *Likewise no voir dire examination exists in respect to grand jurors.* In other words, the status of a member of a grand jury may not be questioned except for lack of legal qualifications.
>
> The basic theory of the functions of a grand jury does not require that grand jurors should be impartial and unbiased. . . . A grand jury does not pass on the guilt or innocence of the defendant, but merely determines whether he should be brought to trial. It is purely an accusatory body. . . . [*Id.* at 20–21; emphasis supplied.]

See also *United States v. Dionisio,* 410 U.S. 1, 16, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Estes v. United States,* 335 F.2d 609, 613 (5th Cir. 1964); *United States v. Commonwealth of Pennsylvania,* 316 F.Supp. 411, 419 (E.D.Pa.1970); *Weekley v. State,* 222 A.2d 781, 785 (Del.Supr.1966).

Appellant in effect argues that a grand jury must be convened as a petit jury—only after an offense is committed and when the accused may examine prospective members. No such right exists and we follow the holding in *United States v. Knowles, supra.*

## IV. JURY DEADLOCK

■ Appellant argues that the trial court coerced the verdict by its refusal to declare a mistrial after the jury announced its inability to render a verdict and that it then gave the approved instruction respecting announced deadlock under *Winters v. United States,* D.C.App., 317 A.2d 530 (1974) (en banc). Looking to all the circumstances surrounding the giving of the *Winters* charge in this case, we cannot agree with appellant's contentions. *See Blango v. United States,* D.C.App., 335 A.2d 230, 233 (1975).

The trial in the instant case lasted three days and involved two codefendants. In contrast, the total amount of jury deliberation time, in view of the complexity and length of the trial, was but twelve to fourteen hours. Moreover, it appears from the record that the jury deliberated for only short spans of time before reporting its inability to reach a verdict on two occasions. An indication from the jury that it may yet be able to reach a unanimous verdict intervened between the two reports of deadlock and delayed the giving of the *Winters* charge. The trial court sent the jury out only once following its *Winters* instruction and a verdict was reached in a reasonable amount of time thereafter. *Compare Thompson v. United States,* D.C.App., 354 A.2d 848 (1976), in which even after a *Winters* instruction, the jury reported that it was still deadlocked; but, nevertheless, requiring further deliberation was found not to have coerced the verdict. We thus conclude that the trial court did not err in giving the *Winters* charge and ordering the deliberations to continue.

## V. THE EVIDENTIARY ISSUE

■ Appellant's final argument is that the trial court erred by admitting into evidence Jackson's wallet and keys. The keys and wallet should not have been admitted into evidence, according to appellant, because an insufficient chain of custody was demonstrated with respect to them, from the time they were found until their identification by Jackson. Moreover, appellant argues, the keys should have been excluded because the government failed to show a necessary connection between him and the keys.

We find no merit in appellant's arguments. Jackson identified both the wallet and the keys as belonging to her and as having been in her purse when she was robbed. Although the keys were not actually recovered from appellant's person, there was substantial evidence in the record to attribute possession to appellant. These factors constituted a sufficient basis for the introduction into evidence of the items in question, and the trial court did not err in so ruling.

*Affirmed.*

KELLY, Associate Judge, concurring in the result:

It is now beyond dispute that in this jurisdiction a delay of one year between arrest and trial, for whatever reasons, gives prima facie merit to a claim of a denial of the right to a speedy trial. *United States v. Clark*, D.C.App., 376 A.2d 434 (1977); *Branch v. United States*, D.C.App., 372 A.2d 998 (1977); *United States v. Mack*, D.C. App., 298 A.2d 509 (1972); *United States v. Holt*, 145 U.S.App.D.C. 185, 448 F.2d 1108, cert. denied, 404 U.S. 942, 92 S.Ct. 292, 30 L.Ed.2d 257 (1971); *Hedgepeth v. United States*, 124 U.S.App.D.C. 291, 364 F.2d 684 (1966). Such a lengthy delay is "presumptively prejudicial" as that term is used in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and places on the government an obligation to justify the delay. *Branch v. United States, supra*; *Smith v. United States*, 135 U.S.App.D.C. 284, 418 F.2d 1120, cert. denied, 396 U.S. 936, 90 S.Ct. 280, 24 L.Ed.2d 235 (1969). To me the disturbing aspect of this case is that a large part of the fifteen-month delay between arrest and trial was caused by a trial judge's failure to rule on appellant's motions to compel discovery and to dismiss

the indictment which, in turn, necessitated several trial continuances.[1] This period approximated one year from the filing of the motions to decision (ten months from the hearing on the motions to decision) and was an institutional delay chargeable to the government in the *Barker v. Wingo* weighting process. *United States v. Brown*, 172 U.S.App.D.C. 92, 520 F.2d 1106 (1975); *United States v. West*, 164 U.S.App.D.C. 184, 504 F.2d 253 (1974).

In my judgment, however regrettable it is that all legal decisions are not made within reasonable time limits, if they are not, the decisional delay becomes unreasonable and weighs heavily against the government in the speedy-trial balancing process. Inordinate delays in deciding motions in the trial court and, indeed, inordinate delays in the appellate process are not readily justified or excused. *See, e. g., United States v. Sarvis*, 173 U.S.App.D.C. 228, 523 F.2d 1177 (1975); *United States v. Brown, supra*; *United States v. West, supra; United States v. Perry*, 353 F.Supp. 1235 (D.D.C. 1973). Having expressed this concern, however, I nevertheless agree that the delay here, when weighed with the other balancing factors, does not require dismissal of the indictment for lack of a speedy trial.

As to the logic of Judge Leventhal's suggestion in *Bundy*,[2] it was accepted by this court in *Jones v. United States*, D.C.App., 343 A.2d 346, 352 (1975), where we said:

> Consequently, we think that in a proper case arising in the future the trial judge may in lieu of any other sanction charge the jury with a variant of the so-called missing witness instruction.

In any event, it is sufficient, without more, to say that the substance of the lost notes

1. One such continuance was for a period of five months. Appellant objected to this continuance and to one other, and there is, of course, no significant difference between an objection to a request for a continuance and a motion to dismiss for lack of a speedy trial.

2. In some circumstances, and particularly in the face of a general routine of preservation, such as the D.C. police have established, the absence of notes may be the kind of mishap

best handled by instructing the jury with an adaptation of the kind of instruction used in case of a missing witness, that the jury is free to infer that the missing original notes would have been different from the testimony at trial and would have been helpful to defendant. . . . [*United States v. Bundy*, 153 U.S.App.D.C. 191, 194, 472 F.2d 1266, 1269 (1972) (Leventhal, J., concurring).]

was incorporated in the radio description, *see Moore v. United States*, D.C.App., 363 A.2d 288 (1976), and therefore a type of missing witness instruction was inappropriate in this case.