UNITED STATES of America

v.

James L. SARVIS, Appellant.

UNITED STATES of America

v.

Irie E. LEONARD, Appellant.

Nos. 74–1935, 74–2033.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 1975.

Decided Nov. 21, 1975.

Albert W. Overby, Jr., Washington, D. C. (appointed by this court), and John B. Dunn, Washington, D. C., for appellant in No. 74–1935.

J. Michael Farrell, Washington, D. C. (appointed by this court), for appellant in No. 74–2033.

Donald L. Abrams, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Eugene M. Propper, and Roger M. Adelman, Asst. U. S. Attys., were on the brief, for appellee. Robert P. Palmer, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Appellants James L. Sarvis and Irie E. Leonard were tried separately on charges growing out of a series of events at the apartment of one Benjamin Rudd on the night of September 15–16, 1970. Each was convicted of robbery and second degree burglary; Leonard was also convicted of first degree murder. They allege numerous errors in the proceedings below, the most substantial of which involve the constitutional right to a speedy trial and the cautionary instruction given regarding the testimony of immunized witnesses.

Their cases have been here before. They were first tried together in mid 1971, along with Francis A. Salters. In that trial Salters was acquitted, Leonard was convicted of first degree murder, armed robbery, and second degree burglary, and Sarvis was found guilty of armed robbery and second degree burglary. We reversed, finding prejudicial error in some of the instructions and in the trial court's action limiting cross-examination of one Government witness. *United States v. Leonard*, 161 U.S.App. D.C. 36, 494 F.2d 955 (1974). Sarvis and Leonard here appeal from the convictions resulting from their separate retrials.

We affirm.

I. Facts

Testimony at the two retrials [1] depicted a brutal robbery and murder of Benjamin Rudd at his apartment at 854 21st Street, N. E., Washington, D. C. When Rudd arrived at his home the night of September 15, 1970, he was grabbed and pulled across the street to his apartment building by two men, identified at trial as Sarvis and Leonard. He apparently escaped their grasp temporarily and took refuge in the apartment of a neighbor, but he was later coaxed back out into the hallway of the building. There Sarvis held him while Leonard struck him, then both searched his pockets, taking his keys and wallet. All of the events in the hallway were witnessed by a number of youthful observers who had gathered on the porch of the building and who watched through a glass panel in the door. Leonard called to one of the group, Francis Salters, to use the keys and open the door to Rudd's apartment, and when he did so, appellants dragged Rudd inside. Leonard and Sarvis held Rudd in the bedroom, while at various times Salters, Albert Jones, and Curtis Hughes carried a number of Rudd's possessions out of the apartment. Others of the group on the porch declined to share in the plunder, but saw those involved carrying items out of the building.

Meanwhile, Leonard and Sarvis were with Rudd in the bedroom. Two witnesses testified that they had seen a badly beaten Rudd on the bedroom floor. Leonard stood over him brandishing a large knife obtained from the kitchen; Sarvis stood nearby holding a small woodcarving knife. Several witnesses heard Leonard say he would kill Rudd because Rudd had seen their faces. None of the witnesses actually saw the lethal blow, but Rudd's battered body was found the next day by a neighbor, and it was determined that he had died from a large knife wound.

The prosecution testimony at the two trials was substantially the same, with one exception. Since Sarvis had been acquitted of murder at the first trial, the judge labored to assure that the fact of Rudd's death did not come out at Sarvis' retrial. He did, however, permit testimony as to all events up to the death, including the scene in the bedroom, with Sarvis holding a knife near the bloodied victim.

Sarvis and Leonard presented separate alibi defenses.

1. Testimony at the two trials was, of course, not exactly the same, and evidence of the death of Rudd was deliberately barred from Sarvis' trial, as indicated more fully *infra*. But since there is no allegation here that the evidence was insufficient to support the convictions, we summarize the facts as they emerged from all the testimony at both trials.

## II. Appellant Sarvis

### A. *The accomplice and immunity instruction*

Jones and Hughes testified for the Government in both trials under a grant of immunity. Appellant Sarvis alleges that the cautionary instruction given to the jury concerning the testimony of immunized accomplices was inadequate and constitutes reversible error.

■ The testimony of accomplices has long been recognized as suspect and deserving of special treatment. *See Crawford v. United States,* 212 U.S. 183, 203–204, 29 S.Ct. 260, 53 L.Ed. 465 (1909); *Bruton v. United States,* 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). It is therefore the usual practice for the court to instruct the jury that such testimony should be received with caution and scrutinized with care. *United States v. Lee,* 165 U.S.App.D.C. 50, 57, 506 F.2d 111, 118 (1974), *cert. denied,* 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975). *See* Instruction 2.22, *Criminal Jury Instructions for the District of Columbia* (2d ed. 1972).

The immunized witness instruction is not blessed with such a long history. In fact, it traces only to our prior decision in this case, where we held that reversible error was committed when the court denied a requested instruction cautioning the jury about the testimony of immunized witnesses. *United States v. Leonard, supra,* 161 U.S.App.D.C. at 42, 494 F.2d at 961. We stated there that we had found no earlier case which so held, but we explored the reasons for the usual cautionary instructions concerning accomplices and paid informants, and we found that the same reasons require the giving of a requested immunity instruction. We limited our holding, however, in this fashion:

> [W]e are not to be understood as saying that, on retrial, if Sarvis and Leonard request an instruction with regard to Jones and Hughes that their testimony is to be viewed with caution both because they were accomplices and because they have been granted immunity from prosecution, they will be entitled to double instructions. Rather, the district court should merge both requests into a single instruction that the testimony of Jones and Hughes is to be scrutinized with caution because they are accomplices and because they have been granted immunity.

161 U.S.App.D.C. at 42–43, 494 F.2d at 961–962.

On retrial Sarvis requested an elaborate instruction which went into detail on the reasons for receiving "with the very greatest care and caution" the testimony of accomplices and immunized witnesses. The court, instead, delivered an instruction appearing in Instruction 2.22, *Criminal Jury Instructions, supra,* modified to add a description of the meaning of immunity. The charge given first defined accomplice in the standard way, then described the meaning of use immunity, reminding the jury that such immunity does not protect the witness from a perjury prosecution. It specifically named two witnesses, Jones and Hughes, both as accomplices and as immunized witnesses. The charge concluded:

> Testimony from an accomplice, *whether or not that accomplice is immunized,* should be received with caution and scrutinized with care. You should give it such weight as in your judgment it is fairly entitled to receive.

Tr. of Instructions, Sept. 3, 1974, at 12 (emphasis added).

■ Sarvis correctly points out that the instruction does not conform perfectly to our directions, for it gives no straightforward indication that the testimony of Jones and Hughes deserves caution precisely "*because* they have been granted immunity." The judge might indeed have done more to indicate that immunity is an independent reason for treating this testimony with care. But if there was error, we do not consider it error affecting substantial rights of the defendant. The jury's attention was

clearly drawn by name to the testimony of the two witnesses who were immunized, and the jury was told to receive that testimony with caution and to scrutinize it with care. An additional clause or sentence more specifically directed to immunity would, as a practical matter, have added little. Moreover, since the testimony of Jones and Hughes was amply corroborated by other witnesses, there is even less reason to think reversal appropriate. *Cf. United States v. Lee, supra,* 165 U.S.App.D.C. at 59–60, 506 F.2d at 120–121.

■ Sarvis presses another objection against the instruction: that it failed to tell the jury the reasons for receiving an immunized witness' testimony with caution, reasons which we set forth in our earlier opinion in this case. 161 U.S. App.D.C. at 42, 494 F.2d at 961. For some types of credibility instructions it is customary to impart to the jury the explicit rationale for exercising caution in receiving the testimony. *See, e. g.,* Instructions 2.21, 2.23, *Criminal Jury Instructions, supra* (testimony of children and informers). Other standard instructions refrain from spelling out the reasons. *See, e. g.,* Instruction 2.22, *id.* (testimony of accomplices). No matter which procedure might be thought appropriate in the case of immunized accomplices, we are once again convinced that the judge's failure to elaborate on the charge here did not affect substantial rights of the defendant. If there was error, it was harmless. Rule 52(a), *Fed.R.Crim.P.*

### B. *Other alleged instructional errors*

Sarvis' other allegations concerning instructional errors may be treated very briefly.

■ 1. There clearly was no error in the trial judge's failure to name Francis Salters explicitly as one of the accomplices whose testimony should be treated with care. In fact, it would have been improper to name him, since Salters had been duly acquitted of all charges at the earlier trial.

■ 2. Sarvis took the stand in his own behalf, and the judge delivered to the jury a form of the approved instruction concerning the testimony of a defendant. Tr. of Instructions, Sept. 3, 1974, at 10–11. *See United States v. Jones,* 148 U.S.App.D.C. 201, 459 F.2d 1225 (1972). Sarvis claims error, however, in the placement of this instruction, for it was followed immediately by the instruction urging special caution in receiving the testimony of accomplices. The jury, he opines, might have thought the judge was instructing special caution in receiving Sarvis' testimony.

There was no error. There are but a limited number of logical sequences which may be used for credibility instructions, and we find no fault with the one employed. Moreover, here, unlike *United States v. Howard,* 139 U.S.App. D.C. 347, 354, 433 F.2d 505, 512 (1970), there was clearly no action of the judge which amounted to a "gratuitous" singling out of the defendant's testimony as deserving of special skepticism.

■ 3. Jeffrey Powell testified for the Government during the first day of trial and was impeached by the defense with a prior burglary conviction. The defense then requested an immediate instruction telling the jury that such information comes in only for purposes of evaluating the witness' credibility. The Government objected, pointing out that Powell was its witness and it did not wish the limiting instruction given. And the court declined to deliver it. The Government's position was correct, and there was no error. Even if there were error, it certainly would not require reversal, since the court gave the same kind of requested instruction the following day and indicated that the admonition applied as well to Powell. Tr., Aug. 27, 1974, at 119.

### C. *Speedy trial*

■ Over three years and 10 months elapsed between the date of Sarvis' arrest and the beginning of his second trial. He understandably contends that

this delay abridged his constitutional right to a speedy trial. U.S.Const. Amend. VI. The Supreme Court has set forth the four factors we are to consider in assessing Sarvis' claim: the length of the delay, the reasons for the delay, the defendant's assertion of his right, and possible prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

The length of overall delay is certainly excessive, but the other factors tend to weigh against a finding that Sarvis' constitutional rights have here been denied. He asserted his right twice—once on March 25, 1971 by moving for a speedy trial, and again on August 9, 1974 by moving for dismissal for lack of a speedy trial. But we note that these two assertions were met rather promptly by commencement of proceedings; his first trial began within two months of the former motion, his second within about two weeks of the latter. Moreover, in each case these assertions of the right followed closely other defense motions which were bound to slow down the proceedings. *E. g.*, motion of February 19, 1971 for additional time to file motions; motion of May 24, 1974 for appointment of new counsel; motion of June 6, 1974 to reset trial from August 5, 1974. It cannot be said that Sarvis has uniformly pressed for the earliest possible trial date.

 Prejudice to a defendant, the Supreme Court has indicated, consists in three factors: incarceration during the time he awaits trial, the anxiety generated by the pending accusations, and, most importantly, any impairment of the defense. Sarvis was incarcerated during the entire period,[2] although we recognize that this factor was mitigated to some extent by the fact that he was given credit for time served against the sentence he finally received.[3] A degree of anxiety may fairly be presumed, although there has been no particularized showing here. Sarvis also claims impairment of his defense, pointing to the inevitable dulling of memories over so long a period of time, and to the unavailability of Linda Armstrong, one of his alibi witnesses, at the second trial. We do not regard this as substantial impairment, however, since Linda Armstrong's testimony at the first trial was available and the relevant portions were read to the jury at the second trial. And a comparison of the testimony at the first trial with that at the second reveals no loss of memory which could be considered damaging to the defense.

We are left to consider the fourth factor, the reasons for the substantial time lag in this case. We do not find it necessary, or productive, to account for every day of the delay. It is sufficient to note that 15 months—eight before the first trial and seven between the issuance of our opinion and the start of the second trial—were consumed in the trial court,[4] and 26 months passed on

---

**2.** We note that Sarvis, unlike Leonard, did not move for bail pending appeal from his conviction in the first trial. Since he raised substantial issues on appeal (on which he ultimately prevailed), he had a right to be released, assuming he could show that he was unlikely to flee the jurisdiction or pose a danger to others. 23 *D.C.Code* § 1325(c) (1973). He thus failed to avail himself of a potential opportunity to reduce the prejudice deriving from continued incarceration. *Cf. United States v. Calloway*, 164 U.S.App.D.C. 204, 209, 505 F.2d 311, 316 (1974).

**3.** *See* 18 U.S.C. § 3568 (1970) (credit against sentence for time spent in custody is mandatory). We are by no means suggesting that granting credit against sentence for time already served will in every case overcome a speedy trial claim. *Cf. Strunk v. United States*, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973) (lower court found a denial of right to speedy trial, imposing "remedy" of reducing sentence to compensate for period of delay; Supreme Court reversed, holding that dismissal is the only possible remedy for denial of the right). In the usual case, credit will not reduce the two most oppressive aspects of prejudice from pretrial incarceration: disrupting the lives of presumptively innocent people and subjecting them to the conditions that characterize most city jails. Here, however, Sarvis was for the bulk of the time serving in a regular penal institution rather than in jail, having been convicted of serious offenses at the first trial.

**4.** There is one other substantial component of the delay in the trial court for which we have been offered no meaningful justification. Five

appeal. For the first trial, the docket reveals no Government motion for continuance, nor has there been any other suggestion of prosecutorial laxness, arbitrariness, or intentional delay. The defendant himself is responsible for some of the delay preceding the first trial. *E. g.*, motion of February 19, 1971, *supra.* Much of the delay attending the second trial was attributable to a string of unsuccessful appointments of defense counsel. We do not suggest that defendant was at fault here—the successive appointments apparently resulted more from scheduling problems of the lawyers appointed than from dissatisfaction on the part of the defendant—but at the same time we cannot count this delay heavily against the Government. The largest component of time was consumed by the appeal. Some of this period passed while the record and briefs were being prepared (seven months), and while the parties awaited scheduling of oral argument (an additional six months). But the bulk of the period constituted the time required for our consideration and writing of the opinion (13 months).

■ For the most part, then, the delay was caused by the workings of the system—"neutral reasons" stemming from court backlog and the press of other business affecting the prosecutor and defense counsel as well as the trial and appellate courts. Although delays of this length are intolerable, no one in particular is to blame for the time lag here. *Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. at 2192, provides guidance in determining how to weigh delays of this sort: "A more neutral reason [for delay] such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since

the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."

This court has had occasion, moreover, to elaborate upon the weighting of appellate delay like that which formed the major component of the time lag in this case. In *United States v. Bishton,* 150 U.S.App.D.C. 51, 54, 463 F.2d 887, 890 (1972), we noted that while a case is pending before an appellate court it is generally "beyond the power of the prosecutor to expedite." We continued:

> Courts, of course, are not excluded from the obligation to give defendants a speedy trial. But the function of appellate courts necessarily casts the delay attendant upon their deliberations in a somewhat different light * * *.

In *Harrison v. United States,* 128 U.S. App.D.C. 245, 249–250, 387 F.2d 203, 207–208 (1967), we held that a delay of six years did not, under the circumstances, abridge the defendants' right to a speedy trial where the major component of delay was appellate consideration.[5] Focusing specifically on a two-year period during which defendants' second appeal was pending, we said:

> The time necessarily consumed in unraveling complex issues whose ultimate resolution vindicates the rights of the accused can hardly be said to constitute purposeful or oppressive delay. We are accustomed to careful study of the questions presented to us, particularly where human life or liberty is at stake * * *. "[T]he essential ingredient is orderly expedition and not mere speed" * * *.

Of course, it would be disingenuous to suggest that the entire time during which a case is under advisement is con-

---

and a half months elapsed between Sarvis' conviction in the first trial and his sentencing. The final week of that delay resulted from the failure of defense counsel to appear at the sentencing hearing first scheduled, but the remainder of the time lapse is unexplained. It is hard to conceive of a justification for such a delay in sentencing. In a closer case it might well tip the balance in favor of a finding that

the defendant had been denied his constitutional rights.

5. Our decision in *Harrison* was reversed on other grounds by the Supreme Court, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), but the Court explicitly approved our ruling on the speedy trial issue. *Id.* at 221–222 n.4, 88 S.Ct. 2008.

**1184**

sumed in unraveling complex issues. This court, like the District Court, is not free from the problem of calendar backlog. It is for this reason that appellate delay must ultimately be considered the responsibility of the Government, even though it is a neutral reason not to be accorded the heavy weight assigned to intentional delay.

█ In sum, this case is a close one, but considering all the circumstances, we do not find that defendant's right to a speedy trial has here been abridged. *United States v. Perry*, D.D.C., 353 F.Supp. 1235 (1973), *affirmed* by order of this court entered December 12, 1973, relied on by Sarvis, is not to the contrary. Here the defendant had a trial and he appealed the conviction. In contrast *Perry* involved an interlocutory appeal by the Government, and the court there found the Government uniquely responsible for large portions of the delay involved in the appeal. Different considerations may apply with respect to delay caused by appeal by the Government, because in such cases the defendant may stand accused for a substantially longer time without facing any trial at all in which his guilt or innocence may be established.[6] We note, however, that with the implementation of the Speedy Trial Act of 1974, Pub.L.No. 93–619, 88 *Stat.* 2076 (to be codified in 18 U.S.C. §§ 3161–3174), trial delays such as in this case should not occur. Moreover, we also note that delays on appeal are not insulated from the due process clause of the Fifth Amendment. *Compare United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Massimo*, 2 Cir., 432 F.2d 324, 326 (1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971). If trial courts must expedite their procedures under the Sixth Amendment no reason appears why appellate courts should not be subjected to similar constitutional constraints. The time has come to move seriously toward genuine assurance that appeals will be considered expeditiously.

#### D. *Evidence of blood and suggestion of homicide*

█ The District Court ruled pretrial that, in view of Sarvis' acquittal in the first trial of the charge of murder, no mention should be made of Rudd's death as a result of the incident. The court did, however, permit testimony as to all events leading up to Rudd's death, including testimony as to Sarvis' knife wielding and the blood found in the apartment. Sarvis contends that this was error. We disagree. When a trial court admirably attempts, as it did here, to avoid any unnecessary prejudice to a defendant, it must at the same time be sure that it does not unduly limit the Government's right to present its case against the defendant for the substantial charges still pending. The challenged testimony described what was undeniably a part of the tangled occurrences that night at Rudd's apartment, and the evidence did have some bearing on the count of armed robbery charged in the indictment.

Nor does the inadvertent mention by one witness of the "Homicide Bureau" necessitate reversal. That remark was not intentionally solicited by the prosecutor, and whatever damage resulted was mitigated by the court's curative instruction delivered shortly thereafter.

### III. Appellant Leonard

Leonard's counsel was permitted to argue before us the speedy trial and immunity instruction issues, since Leonard had

---

**6.** Similarly, *United States v. Brown*, 172 U.S. App.D.C. ——, 520 F.2d 1106 (decided Aug. 1, 1975), does not require reversal here. The bulk of the four-year delay found to violate the Constitution in that case consisted of two years and five months devoted to resolution of a motion to suppress certain evidence. *See id.* (McGowan, J., concurring). Part of that time passed, as in *Perry, supra*, while this court considered the Government's interlocutory appeal from the District Court's order suppressing the evidence. But the trial court itself had taken an unreasonably long time—10 months—to consider the motion, with the ultimate result that the defendant remained in jail for four years before he faced any trial at all on the narcotics charge.

been subject to the same delays, and almost the identical instruction had been delivered at his trial. However, Leonard, unlike Sarvis, never asserted his right to speedy trial; in fact, he sought to delay the second trial until after that of Sarvis was completed. With respect to the immunity instruction issue, not only did Leonard fail to object to the instruction given, but his counsel actually agreed expressly that it was acceptable. Tr. at 804–805. Our disposition of these issues in Sarvis' case necessarily results in affirmance of Leonard's conviction.

We have carefully considered all other issues raised by either appellant, and we find them to be without merit. The convictions are

*Affirmed.*