Anthony HORDGE, Appellant,

v.

UNITED STATES, Appellee.

Gregory T. McBRIDE, Appellant,

v.

UNITED STATES, Appellee.

Nos. 85–1419, 85–1558.

District of Columbia Court of Appeals.

Argued April 12, 1988.
Decided July 21, 1988.

Karen L. Hochstein, Washington, D.C., appointed by this court, argued the case,

for appellant Hordge. Steven R. Kiersh, Washington, D.C., appointed by this court, was on the brief, for appellant Hordge.

Ronald Horton, Public Defender Service, with whom James Klein, Public Defender Service, Washington, D.C., was on the brief, for appellant McBride.

Patricia A. Riley, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., at the time the brief was filed, and Michael W. Farrell and William M. Jackson, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, BELSON and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellants were found guilty by a jury of armed robbery. D.C.Code §§ 22–2901, –3202 (1981 & 1987 Supp.). On appeal they contend that the evidence was insufficient to support their convictions. We disagree. McBride also contends that the trial court erred in failing to instruct the jury, as requested, that Hordge's post-arrest statement to the police could not be used as substantive evidence of McBride's guilt, and that because it was so used by the prosecutor during cross-examination of Hordge and in rebuttal closing argument, McBride's conviction must be reversed. We agree that the trial court erred in refusing to give the requested instruction and that the error was not harmless. Accordingly, we affirm Hordge's conviction and reverse McBride's conviction.

I

On November 3, 1983, Nyaitondi Masagate, a parking lot cashier at the Washington Hospital Center, was counting money in his booth at lot no. 3 in preparation for making a deposit into a safe. As he did so, appellant Hordge, whom Masagate had never seen before, approached him with a five dollar bill in his hand and asked for change. Masagate asked Hordge to wait a moment, and as Masagate was about to drop the money in the safe, Hordge pulled a gun on him, told him to look down, and demanded all the money. Hordge grabbed the money from the drawer and Masagate gave him all of the money he had in his pockets. After he had taken the money, Hordge ordered Masagate out of the booth, placed the gun under his arm, and walked with Masagate across the parking lot. As security guards approached, Hordge threw the money at Masagate and the gun between some cars, saying "[H]ere man[,] I was kidding. I was not robbing you." Masagate told the guards to seize Hordge because he was robbing him.

Melissa Hill, a special police officer at the hospital, had noticed on two occasions a white car occupied by two black males driving on the main service road of the hospital. The first sighting occurred about 3:15 p.m. that day. The second occurred about 5:20 p.m.; while patroling the hospital grounds in the patrol car with Sgt. John Henry Jackson, Hill saw the same car again parked next to lot no. 3 with its emergency lights flashing and the motor running, this time occupied by only one man. Hill pulled along side and Jackson asked McBride "why he was sitting there and if he was waiting on someone." McBride replied that he was not waiting for anyone and that he had just stopped to get some chewing gum out of the glove compartment. Hill and Jackson instructed McBride to move his car and he complied. Hill then noticed Masagate walking with another man, later identified as Hordge, who appeared to have something in Masagate's back, and she told Jackson to broadcast a radio call for emergency assistance. After making the broadcast, Jackson proceeded towards Masagate and Hordge, while Hill broadcast a description of the car. Jackson twice called to Hordge to stop, and he did so only after tossing an object under a car, which was later recovered and identified as a small starter pistol.

Lynwood Belcher, a special police officer at the hospital, received an emergency radio call at about 5:30 p.m. When he ar-

rived at the scene Hordge was already in custody, so Belcher returned to his car to look for the white car. He heard that the car had just passed the front circle and had left the property. As he proceeded around the property, he spotted a car that fit the description entering the hospital grounds and confirmed that it had the partial tag number broadcast by Hill. The car left the hospital grounds and returned again. After Hill positively identified the car, Belcher stopped it, and both Hill and Jackson positively identified the car and McBride on the basis of their encounter with him.

In defense Hordge testified that he first met Masagate sometime in October, 1983, when he was jogging through the hospital parking lot and stopped at the cashier's booth to ask the time. After noticing an aroma of marijuana, Hordge mentioned it to Masagate, who then offered Hordge some to take with him. Hordge returned two days later and purchased an ounce of marijuana from Masagate. On the day of the incident, Hordge again contacted Masagate and purchased $150 worth of marijuana. After trying some of the marijuana, Hordge was dissatisfied with its quality and returned to the hospital to complain. When Masagate told him he was too busy to talk, Hordge went home and obtained a starter pistol, which he tucked in his waist, and returned to the hospital. On his way to the hospital, Hordge noticed his neighbor and friend McBride standing at a bus stop and offered him a ride. After McBride got into the car, Hordge explained that he had something to take care of and asked McBride to sit in the car until he was finished. He did not tell McBride the nature of the business.

After returning to the hospital service road, Hordge got out of the car and returned to the booth, demanding either "my product or my money back." Masagate told him that he only had $95 on him but had the rest of the money and "something else I could work with in the car." Hordge opted for "the product" and the two men started walking into the parking lot. Suddenly, an officer came up and told Hordge to freeze. Hordge asked Masagate what was happening, and Masagate said that he did not know. The two men split up and Hordge threw the starter pistol and money under a car because he was on parole and knew that he should not have such a weapon.

On cross-examination, Hordge acknowledged that "it is important when you are working with somebody not to sort of give him up helping you do a crime." While he admitted going up to the cashier's booth with a starter pistol, he denied taking the gun out and pointing it at Masagate. He could not recall the dates or even the days of the week on which he claimed he bought marijuana from Masagate. Although he had testified on direct that McBride was a neighbor and friend, on cross-examination he claimed that McBride was not a personal friend, but rather a neighborhood friend, someone to say hello to. Nevertheless, he turned his car over to McBride while he went "with a gun to collect some supposed dope." Hordge admitted that at the time of his arrest he did not tell the police that McBride did not know what was going on or that the episode involved a dispute over marijuana. He denied, however, telling a police officer that he had gone to the hospital to look for a job, that when he came back out his car was gone, that he went to ask the parking attendant where his car was and the next thing he knew he was arrested. He acknowledged having told a police officer that he parked his car at a construction site leaving the keys in it. Hordge was impeached with his 1974 convictions for robbery and armed robbery.

McBride did not testify but called three witnesses in support of his defense of innocent presence. Calvin Fredericks, a senior rehabilitation technician at the hospital, testified that on November 3 he had a conversation with McBride in the hospital lobby shop between 4:30 and 5:00 p.m., and McBride had given him his business card when McBride was unable to locate the maintenance person he was there to see.

On cross-examination, the prosecutor probed Fredericks' remembrance of the date of the conversation. Fredericks was unable to point to anything unusual that happened on that day which would indicate why he recalled the date other than as a result of a couple of phone calls he had with a lawyer. Marian Bridgeman, president of a janitorial firm which employed McBride, testified that on November 3 McBride was a marketing and sales representative and was scheduled to visit the hospital on that date. On cross-examination, Bridgeman acknowledged that she could not keep track of all her sales representatives at every moment of the day and that she did not accompany McBride that day. McBride's wife, Tanya, testified that she was supposed to meet her husband at the Brookland subway station at 4:50 p.m. She arrived at the station a minute or two after 5:00 and McBride was not there. She waited a few minutes, then telephoned his beeper service a couple of times, and McBride returned her call after the third try. She waited for McBride to appear, and after a few more minutes telephoned him again as a signal that she intended to walk home. As she was walking home, she heard a car horn and saw her husband driving a white car. He gave her a ride home and then left saying that he was going to return the car to its owner.

On rebuttal, the government called Detective Robert Good who testified that he had taken a statement from Hordge after advising him of his rights and obtaining a waiver of his *Miranda*[1] rights. Hordge told Good that

> the reason he was at the hospital center was he went up there in his car to look for a job. And he had been inside the hospital center looking for a job. When he came back out, he discovered that his car was gone. He then stated the reason that he was talking to the parking lot attendant, he was asking the attendant whether or not he knew what happened to his car, whether somebody had taken

it or whether the police had come along and towed the car. I asked him if he had left the keys in the car. He said he did. He left the keys in, in case one of the construction people, there was construction work being done, needed to move his car.... And he stated that he didn't know Mr. McBride.

## II

Both appellants contend that the evidence was insufficient to support their convictions for armed robbery. Hordge contends that the government failed to prove the specific intent required for robbery in view of evidence he argues establishes a claim of right to the money. McBride claims that his mere presence at the scene, without more, cannot support his conviction as an aider and abettor of Hordge in the robbery. McBride also contends that without proof that he knew Hordge would use a gun, the evidence was insufficient to support a conviction for armed robbery.

"[R]ecognizing the jury's prerogative to weigh the evidence, determine the witnesses' credibility, and draw reasonable inferences from the evidence presented, [this court] may reverse on grounds of insufficiency only if 'there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *Payne v. United States*, 516 A.2d 484, 493 (D.C.1986) (quoting *Curley v. United States*, 81 U.S.App.D.C. 389, 392–93, 160 F.2d 229, 232–33, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947)). "In conducting such a review, we must assess the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences to be drawn from the evidence." *Payne, supra,* 516 A.2d at 493; *McClain v. United States*, 460 A.2d 562, 567 (D.C. 1983). In addition, no distinction is made between direct and circumstantial evidence. *Jackson v. United States*, 395 A.2d 99, 102 (D.C.1978). Where the defendant testifies or puts on evidence, the question of suffi-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ciency turns on all of the evidence that is before the jury. *Hawthorne v. United States*, 476 A.2d 164, 168 n. 10 (D.C.1984).

### A.

■■■■ Viewing the evidence in the light most favorable to the government, Hordge's contention that the evidence against him is insufficient is meritless in view of the unshakeable testimony of the parking lot attendant, and the security guard, and Hordge's own contradictory testimony.[2] McBride's contention, that the evidence was insufficient to show he aided and abetted Hordge's armed robbery by acting as the potential getaway driver, is not as easily disposed of. McBride argues that the primary evidence against him was that he was seated in Hordge's car at some distance from the parking lot at the time of the robbery and that his mere presence is insufficient to support an inference of his guilty participation in Hordge's crime.

Aiding and abetting another to commit a crime, D.C.Code § 22–105 (1981), is established if the defendant, "in some sort associate[d] himself with the venture, ... participate[d] in it as in something that he wished to bring about, ... [and sought] by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.). "Mere presence at the scene of the crime, without more, is gener-ally insufficient to prove involvement in the crime, *e.g.*, *Creek v. United States*, 324 A.2d 688, 689 (D.C.1974), but it will be deemed enough 'if it is intended to [aid] and does aid the primary actors.'" *Settles v. United States*, 522 A.2d 348, 357 (D.C. 1987) (quoting *Bailey v. United States*, 135 U.S.App.D.C. 95, 98, 416 F.2d 1110, 1113 (1969)) (footnote omitted); *compare Perry v. United States*, 276 A.2d 719 (D.C.1971) (mere presence and slight prior association) *with Forsyth v. United States*, 318 A.2d 292 (D.C.1974) (presence coupled with flight and several other circumstances). "Presence is thus equated to aiding and abetting when it is shown that it designedly encourages the perpetrator, facilitates the unlawful deed—as when the accused acts as a lookout—or where it stimulates others to render assistance to the criminal act." *Bailey, supra*, 135 U.S.App.D.C. at 98–99, 416 F.2d at 1113–14 (footnotes omitted). To support a conviction of aiding and abetting, the evidence must show that the defendant assisted or participated in another's commission of crime and that he did so with culpable purpose, *id.* at 98, 416 F.2d at 1113, or guilty knowledge. *Byrd v. United States*, 364 A.2d 1215, 1219 (D.C.1976); *see Downing v. United States*, 434 A.2d 409, 412 (D.C.1981) (Ferren, J., concurring) (a knowing association with the criminal venture and an intent to commit the crime).

In *Clark v. United States*, 418 A.2d 1059 (D.C.1980), on which McBride relies as dis-

---

**2.** Hordge's reliance on *United States v. McGill*, 159 U.S.App.D.C. 337, 487 F.2d 1208 (1973), is misplaced. In *McGill*, the government failed to introduce any evidence that the money the complainant said he had in his pocket was actually taken or carried away by the robbers. *Id.* at 338, 487 F.2d at 1209. Here there was ample evidence that Hordge took and carried away money from the attendant at gunpoint.

Hordge's other contentions on appeal are without merit. Hordge argues that the trial court erred in refusing to give a claim of right instruction based on his testimony that Masagate had sold him poor quality marijuana and that he was merely asking for the product he was owed or his money back. By his own account, however, Hordge did not display the pistol, use any force or take any money from Masagate. Thus, he was not entitled to a claim of right instruction. *Rhodes v. United States*, 354 A.2d 863, 864 (D.C.1976).

Hordge also contends that the trial court erred in denying his motion for a mistrial as a result of certain remarks made by McBride's counsel during closing argument. In his closing, McBride's counsel commented:

[W]hen you turn to Mr. McBride, ladies and gentlemen, ... you have got proof that Mr. McBride got caught in something. Maybe what he knew about Mr. Hordge, maybe he should have known better. Maybe he was stupid. But he is not guilty, ladies and gentlemen. And that is the verdict I ask you to return.

Assuming that this statement was improper, any prejudice was mitigated by the judge's cautionary instruction that the arguments of counsel are not evidence, and the comment is harmless in view of the overwhelming evidence of Hordge's guilt.

positive of his appeal, the evidence established that the defendant had known the primary suspect, McLaughlin, for two or three months before the crime. On the evening of the robbery, Clark drove McLaughlin to the vicinity of the robbery, circled around the block while the robbery was in progress, and picked up McLaughlin again after the robbery was completed. When a police car signaled for Clark to pull over, soon after McLaughlin reentered the car, Clark did so immediately. The government also established that Clark had denied knowing McLaughlin on the evening of McLaughlin's arrest. *Id.* at 1060. Noting that "personal knowledge, while often not susceptible to direct proof, is required for a conviction," *id.* at 1061, the court concluded that there was insufficient evidence of Clark's guilty knowledge to support his conviction. The court recognized that based on Clark's denial of knowing McLaughlin, one might infer that Clark knew of McLaughlin's guilt and wanted to avoid association. *Id.* The court concluded, however, that "in the context of these facts we think this evidence is too sketchy and tentative to permit such a weighty inference given the applicable standard of proof." *Id.*

> Not only did the government fail to prove that [Clark] knew of McLaughlin's criminal behavior, but [Clark's] normal driving speed after McLaughlin entered the car and [Clark's] immediate cooperative stop upon the activating of the police emergency equipment argues against any inference of guilt available from other evidence.

*Id.*

 The government argues that *Clark* is distinguishable because the evidence against McBride is stronger than the evidence in *Clark*. Viewed in the light most favorable to the government, the evidence showed that two men were observed circling the hospital parking lots two hours before the robbery. As Hordge was robbing the parking attendant, McBride was seated in the driver's seat of Hordge's car

a short distance away and easily within view of the parking attendant's booth; the car's emergency lights were flashing and the car's motor was running. When asked by Sgt. Jackson "why he was sitting there and if he was waiting on someone," McBride replied that he was not waiting for anyone but had simply pulled over to get a stick of chewing gum. Hordge, while disavowing McBride's complicity in the robbery, testified that he had left McBride in the car while he went to tend to some business. Shortly after the robbery, McBride, having left the area after speaking to Sgt. Jackson, circled back twice to the area where Hordge had gotten out of the car.

From this evidence the jury reasonably could conclude that Hordge and McBride had been casing the hospital grounds for some time before the robbery. Although Hill did not identify McBride on the basis of her first sighting of the car, the jury could infer from Jackson's conversation with McBride, who was then the only occupant of the car which was in the same location in which Hill had observed it a short time earlier, that McBride had been one of the two men who had been driving around the hospital grounds. The jury also could conclude from McBride's location in the driver's seat of Hordge's car, that Hordge had lied, in order to conceal McBride's involvement in the robbery, when Hordge testified he had picked up McBride to give him a ride home (which would have placed McBride in the passenger seat). *Compare McBride v. State*, 338 So.2d 567, 568 (Fla.Dist.Ct.App.1976) (defendant seated in passenger seat of husband's car) *with Lipscomb v. State*, 254 Ind. 642, 643–44, 261 N.E.2d 860, 861 (1970) (defendant seated in driver's seat of own car).

The jury further could find that McBride had a clear view of Hordge when he was with Masagate. No evidence was offered to show that McBride's line of sight was obstructed. A photograph showed that there were no trees or bushes between

McBride and the parking lot booth. Thus, McBride's view of Hordge's encounter with Masagate was unobstructed even if cars were parked in the lot nearest the service roadway where McBride was sitting in the car.

In addition, the jury reasonably could infer McBride's consciousness of guilt from McBride's lie to Sgt. Jackson that he was not waiting for anyone. McBride's lie was materially different from the lie in *Clark:* when Clark lied, the codefendant, McLaughlin, had already been arrested and even an innocent person might have feared association with McLaughlin. *See Bailey, supra,* 135 U.S.App.D.C. at 100, 416 F.2d at 1115 ("men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties"). When McBride lied, the officers did not suspect him of any wrongdoing and they were then unaware of any trouble involving Hordge; there was no apparent reason for McBride to fear association with Hordge. McBride's lie consequently revealed a consciousness of guilt that Clark's lie did not. Finally, the jury could infer that when McBride was ordered to move his car he was unaware that Hordge had been apprehended, and circled back twice to pick up Hordge as they had originally planned.

Therefore, we hold, on the basis of the evidence of prior association, presence at the scene, McBride's location in the driver's seat of Hordge's car with the motor running, his unobstructed view of Hordge and Masagate, and his fabrication indicating a consciousness of guilt, that there was sufficient evidence for the jury to find beyond a reasonable doubt that McBride aided and abetted Hordge's robbery.

## B.

We also hold that there was sufficient evidence from which the jury reasonably could infer that McBride was aware Hordge would use a weapon to rob Masagate. McBride claims there was no such evidence because, while he and Hordge were together, Hordge kept the gun tucked in his waistband, and because the robbery could have been accomplished by seizing the money in Masagate's hands. The general proposition, on which McBride relies, is that an aider and abettor should be held liable only for the degree or grade of crime which is consistent with the person's own mental culpability. *See Christian v. United States,* 394 A.2d 1, 48 (D.C.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *see also* 1 C. TORCIA, WHARTON'S CRIMINAL LAW § 35, at 180 (14th ed. 1978). He concedes, however, that there need not be direct proof of knowledge by the accomplice that the principal was armed; it is sufficient if there is evidence to support a reasonable inference that the accomplice was aware the crime would be committed "while armed." *See Clark, supra,* 418 A.2d at 1061.

In this jurisdiction, one who aids and abets a felony "is legally responsible for all acts of the other persons which are in furtherance of the common purposes, design, or plan to commit the felony...." *Battle v. United States,* 515 A.2d 1120, 1128 (D.C.1986); *see Williams v. United States,* 478 A.2d 1101, 1106 n. 5 (D.C.1984) (D.C.Code § 22–105 abolishes the distinction between principals and aiders and abettors). But even if there were a requirement that the accomplice have actual knowledge that the principal was armed, the evidence before the jury permitted such a finding. A jury reasonably could find that Hordge was unlikely to have kept the gun in his waistband for the entire two-hour period that he and McBride were together and that for this type of crime it was reasonably foreseeable that some type of weapon was required. *See United States v. Grubczak,* 793 F.2d 458, 463 (2d Cir.1986); *United States v. Sanborn,* 563 F.2d 488, 490 (1st Cir.1977).

## III

McBride also contends that the trial court erred in refusing to instruct the jury that it could not consider Hordge's post-ar-

rest statement denying that he knew McBride as substantive evidence in assessing McBride's guilt, and that the failure to do so was not harmless.

When Hordge testified on direct examination that he had simply given McBride a ride home, the prosecutor confronted Hordge during cross-examination with his post-arrest statement to Detective Good that he did not know McBride. At that point McBride's counsel moved for a severance and, alternatively, if a severance was denied, requested the court to give a modified version of Standardized Criminal Jury Instruction No. 2.48,[3] advising the jury that it could not use Hordge's statement as evidence against McBride. The trial court denied the motion for a severance and initially agreed to give a limiting instruction at the proper time. McBride's counsel renewed the request for the limiting instruction upon completion of the prosecutor's cross-examination of Hordge, but the trial court decided that the instruction would be inappropriate since Hordge had denied making the statement. Counsel also argued that Hordge's statement, that he left the car at the construction site with the keys inside it, was an out-of-court statement that was different from McBride's version of what had happened, and that since it was admitted for a limited purpose to impeach Hordge's credibility, McBride was entitled to the limiting instruction that the evidence could not be used against him. The court disagreed. McBride's counsel again requested the limiting instruction during the government's rebuttal case and the trial court agreed, in discussing the instructions to be given to the jury at the close of all the evidence, to give the instruction. Thereafter, however, the trial court ruled that the requested instruction should not be given.[4] Instead, in the final instructions to the jury, the trial court instructed the jury that Hordge's post-arrest statement was to be used only to evaluate Hordge's credibility. Consequently, the jury received no limiting instruction at the time Hordge was impeached with his post-arrest statement and was never instructed during the trial that Hordge's statement could not be used as evidence of McBride's guilt.

As an admission, Hordge's post-arrest statement could not be used as substantive evidence against McBride. *Carpenter v. United States*, 430 A.2d 496, 500 (D.C.) (en banc), *cert. denied*, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). As a prior inconsistent statement, Hordge's post-arrest statement had no probative value against McBride, and McBride was entitled to have the jury immediately instructed, as he requested, that Hordge's statement could not be used as substantive evidence against him. *Brooks v. United States*, 448 A.2d 253, 259 (D.C.1982); *Scott v. United States*, 412 A.2d 364, 368–69 (D.C.1980); *Borrero v. United States*, 332 A.2d 363, 366 (D.C.1975); *see Sherrod v. United States*, 478 A.2d 644, 661 (D.C. 1984).

The trial court has a continuing obligation to grant a severance if undue prejudice arises as a result of joinder at any time during trial. *See Evans v. United States*, 392 A.2d 1015, 1024 (D.C.1978).

3. Standardized Criminal Jury Instruction No. 2.48 provides:
 A voluntary confession or admission constitutes evidence only against the defendant making it. It is not evidence against any other defendant. You must not consider it in determining the [guilt or innocence] [credibility] of any other defendant.
 McBride's counsel requested that the trial court substitute the word "statements" for the phrase "confession or admissions."

4. The trial court expressed concern about the language in standardized instruction No. 2.48 that the statement would not come in as substantive evidence, and thought that McBride's concern would be adequately addressed if the court instructed the jury that evidence admitted against one defendant could not be used against the other defendant. *See* Standardized Criminal Jury Instruction No. 2.53. The court also denied McBride's request that the court refer to Hordge's out-of-court statements in giving instruction No. 2.53 so the jury would specifically be informed that the statements were covered by the instruction.

McBride had filed a pretrial motion under Super.Ct.Crim.R. 14 to sever his trial from Hordge's trial on the grounds that the government would use Hordge's post-arrest statement "which inculpates [McBride]," that appellants had conflicting defenses and that the disparity between the evidence against Hordge and himself would work to his disadvantage in a joint trial.[5] McBride renewed his motion for severance at the beginning of the trial and when Hordge was impeached with his post-arrest statement. In view of McBride's pretrial motion to sever, which was denied without prejudice, and the trial court's denials of his renewed motions on two other occasions, the trial court assumed a heightened obligation to assure that McBride was not prejudiced as a result of the joinder. *See Carpenter, supra,* 430 A.2d at 501 ("once a severance is presented the court has a continuing duty to take adequate measures to guard against unfair prejudice from joinder") (citations omitted); *United States v. Leonard,* 161 U.S.App.D.C. 36, 45–46, 494 F.2d 955, 964–65 (1974) (citing *Schaffer v. United States,* 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960) ("judge was acutely aware of the possibility of prejudice and was strict in his charge [to the jury]")), *appeal after remand,* 173 U.S.App.D.C. 228, 523 F.2d 1177 (1975); *see also Nelson v. O'Neil,* 402 U.S. 622, 627, 91 S.Ct. 1723, 1726, 29 L.Ed.2d 222 (1971); *Washington v. United States,* 470 A.2d 729, 731 (D.C.1983) (per curiam), *cert. denied,* — U.S. —, 107 S.Ct. 1957, 95 L.Ed.2d 530 (1987); *Ready v. United States,* 445 A.2d 982, 987 n. 10 (D.C.1982), *cert. denied,* 460 U.S. 1025, 103 S.Ct. 1279, 75 L.Ed.2d 498 (1983). Instead, the trial court repeatedly refused to give the requested limiting instruction and provided no other guidance for the jury on the limited use of Hordge's statement until after closing arguments, and then did not instruct the jury that Hordge's statement could not be used as evidence against McBride.[6]

On cross-examination the prosecutor questioned Hordge about the importance of not "snitching" on someone who had helped him commit a crime. The cross-examination was not objectionable insofar as it related to Hordge, but it also cast McBride in the posture of the accomplice. In rebuttal closing argument, the prosecutor used Hordge's false statement as proof of McBride's guilty knowledge of the armed robbery. The argument did not expressly urge the jury to find McBride guilty because Hordge had lied about McBride's involvement, *see Parks v. United States,* 451 A.2d 591, 613 (D.C.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); *see also Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974), but the argument left little doubt about its implication.

In rebuttal argument the prosecutor reviewed the evidence against Hordge and

5. McBride also sought a severance because Hordge had expressed a willingness to provide exculpatory testimony for McBride and because McBride, unlike Hordge, did not intend to testify at trial.

6. The government argues that there was no reason to instruct the jury that Hordge's statement could not be used as evidence of McBride's guilt, citing *United States v. Livingston,* 816 F.2d 184, 191 (5th Cir.1987) (where statements clearly are not hearsay and an instruction is given on prior inconsistent statements, it is unnecessary for the court to give an instruction like standard jury instruction No. 2.48). This argument fails to consider the implications of the denial of McBride's pretrial motion to sever his trial which called the court's attention to the specific areas of potential prejudice of which McBride complains on appeal. In *Livingston,* no motion seeking a severance of the trials appears to have been made. In any event, even had such a motion been made, that case is not binding on this court and might well be inconsistent with our holdings on the vigilance required by the court after a motion to sever is denied. We also disagree with the government's contention that the only appropriate instruction in *United States v. Gilliam,* 157 U.S.App.D.C. 375, 484 F.2d 1093 (1973), on which McBride relies, where no limiting instruction was given, would have been standard instruction No. 1.06 since, as the District of Columbia Circuit noted, the statement was used for more than impeachment. *Id.* at 378, 484 F.2d at 1096.

the various grounds on which the jury should conclude that his testimony was not credible. After pointing out the strength of Masagate's testimony against Hordge, the prosecutor noted the inconsistency of Hordge's trial testimony with his post-arrest statement denying he knew McBride. Then, addressing the evidence against McBride, the prosecutor pointed out that while Masagate had not accused McBride, McBride had been seen driving the car before the robbery and that the testimony of McBride's witnesses was either inconclusive (Fredericks and Bridgeman) or biased (Tanya McBride).

Because of the nature of Hordge's post-arrest statement, an attack on his credibility had a negative effect on McBride's defense of innocent presence. Thus, even if the prosecutor did not expressly urge that Hordge's prior inconsistent statement proved McBride's guilt, the juxtaposition of the rebuttal comment, at the end of the assessment of Hordge's credibility, that "you are not supposed to give up your friend who is helping you do the armed robbery," with the beginning of the discussion of the evidence against McBride, came perilously close to urging the jury to infer exactly that. Therefore, the trial court's instructions to the jury assumed added significance in order to assure that McBride was not prejudiced by the prosecutor's use of Hordge's post-arrest statement. *See Curry v. United States*, 520 A.2d 255, 267 (D.C.1987) (no opportunity for defense counsel to respond to prejudicial remarks that occur in prosecutor's rebuttal argument); *Gilliam, supra* note 6, 157 U.S. App.D.C. at 379–80, 484 F.2d at 1097–98 ("closing argument cannot be read in isolation but must be viewed in connection with the failure to give the necessary cautionary instruction").

The trial court instructed the jury that Hordge's post-arrest statement denying that he knew McBride was to be used only in evaluating Hordge's credibility.[7] The court also instructed the jury that evidence admitted against one defendant could not be used against the other defendant, and that the arguments of counsel are not evidence. No cautionary instruction in the nature of standardized instruction No. 2.48 was given, however. Thus, while the instructions were comprehensive as to Hordge, they failed to provide adequate guidance to the jury about how Hordge's impeachment affected proof of McBride's guilt.

The evidence of McBride's guilty knowledge of Hordge's "business" with Masagate was minimal. The prosecutor's rebuttal argument shored up this weakness in the government's case. Because prosecution of McBride was based on an aiding and abetting theory, the prosecutor's use of Hordge's post-arrest statement to impeach his trial testimony exculpating McBride created a substantial risk that the jury would conclude that because Hordge was lying at trial, McBride was guilty. This was exactly the prejudice that concerned McBride in seeking the severance of his trial, and we are unable to conclude that the absence of the requested cautionary instruction when Hordge was impeached and its absence in the final instructions to the jury were harmless. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *see Brooks, supra,*

---

7. The trial court instructed the jury that:

Now, evidence has been introduced that the Defendant Hordge made a statement concerning the crime charged. The defendant's statement is admitted into evidence solely for your consideration in evaluating his credibility as a witness. The testimony of a defendant may be discredited or impeached by showing that he has previously made statements which are inconsistent with his present testimony. The prior statement is admitted into evidence solely for your consideration in evaluating the credibility of the defendant. It is not to be considered as evidence of the defendant's guilt of the offense with which he is charged.

You must not consider the alleged statement as establishing the truth of any fact contained in it. You must not draw any inference of guilt against the defendant from his alleged statement. You may consider it only in connection with your evaluation of the *credence to be given his present testimony in court.* (Emphasis added.)

448 A.2d at 260; *Borrero, supra,* 332 A.2d at 366; *see also Hawthorne v. United States,* 476 A.2d 164, 172 (D.C.1984) (citing *Berger v. United States,* 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)); *Gordon v. United States,* 466 A.2d 1226, 1231–32 (D.C.1983); *Lucas v. United States,* 436 A.2d 1282, 1285 (D.C.1981); *cf. Jenkins v. United States,* 541 A.2d 1269, 1274 (D.C. 1988). The likelihood of prejudice was too great in view of the disparity of evidence against McBride and Hordge and the likely assumption by the jury, upon hearing the prosecutor's cross-examination of Hordge and rebuttal argument by the prosecutor, that it could draw inferences from Hordge's impeachment in weighing the evidence of McBride's guilt. In addition, the prejudice to McBride was aggravated by the prosecutor's misstatement in rebuttal closing argument to the jury that Fredericks did not recall the date McBride was at the hospital in connection with his employment; contrary to the prosecutor's argument to the jury, Fredericks remained firm during cross-examination in his assertion that he recalled his meeting with McBride on the day of the robbery.

 Accordingly, we affirm the judgment of conviction of Hordge and reverse the judgment of conviction of McBride.[8]

---

**8.** McBride's contention that the trial court abused its discretion in admitting into evidence an arrest photograph not disclosed during discovery is without foundation. McBride did not disclose his defense of innocent presence until opening argument, and his photograph was not relevant to the government's case until that time. Super.Ct.Crim.R. 16(a)(1)(C). Since the photograph was introduced shortly after McBride's opening statement, McBride would have had little time to change his trial strategy. McBride did not specifically request discovery of his arrest photograph, *see Lee v. United States,* 454 A.2d 770, 776 (D.C.1982), *cert. denied,* 464 U.S. 972, 104 S.Ct. 409, 78 L.Ed.2d 349 (1983), and we find no basis for the claim that defense counsel was unfairly surprised to learn of the *existence* of the photograph.