STATE of Wisconsin, Plaintiff-Respondent,

v.

Clyde Baily WILLIAMS, Defendant-Appellant.†

Court of Appeals

*Nos. 03–0603, 03–0604. Submitted on briefs January 8, 2004.—*
*Decided February 11, 2004.*

2004 WI App 56

(Also reported in 677 N.W.2d 691.)

† Petition to review denied 4-20-04.

763

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Margaret A. Maroney*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *David J. Becker*, assistant attorney general.

Before Anderson, P.J., Brown and Nettesheim, JJ.

¶ 1. BROWN, J. Clyde Baily Williams appeals from judgments of conviction for one count of first-degree sexual assault of a child contrary to WIS. STAT. § 948.02(1) (2001–02)[1] arising from a 1996 incident and two counts of first-degree sexual assault of a child contrary to § 948.02(1) arising from separate 1990 incidents and an order denying his postconviction motions for relief. Williams raises three arguments on appeal. First, he argues that his double jeopardy rights were violated when the trial court improperly granted the State's request for a mistrial and ordered a new trial over Williams' objection when Williams' counsel posed an improper question to a State witness. Second, he contends that the two-year and eleven-month delay between the grant of the new trial after he had successfully appealed his original conviction and the commencement of the second trial violated his right to a speedy trial. Finally, he submits that because the prosecutor filed two counts of first-degree sexual assault based on the 1990 sexual assaults only after Williams successfully appealed his original conviction for the 1996 sexual assault, those two charges were presumptively the product of prosecutorial vindictiveness. We reject each of Williams' arguments and affirm.

¶ 2. The relevant facts are as follows. In 1990, two sisters, Annitra J. (d.o.b. 8/12/84), and Okima J. (d.o.b. 10/1/83), told police that Williams sexually assaulted them in a men's bathroom in a Racine city park. After an investigation, the State concluded that "there wasn't adequate basis to prosecute."

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

¶ 3. In 1996, the State charged Williams with the sexual assault of Tyfonia S. (d.o.b. 8/17/90). Tyfonia had alleged that Williams touched her vaginal area while the two were in an elevator. Prior to the first trial concerning the 1996 charge, the prosecutor moved to admit "other crimes" evidence involving the 1990 allegations of Annitra and Okima. The court directed the State to raise the issue during trial and said it would decide the issue outside the jury's presence. At that time, Williams' counsel informed the court that he had a witness who may testify about "the prior sexual experience of [Tyfonia] that relates to her . . . fabricating this incident." The court instructed Williams' counsel that before he asked a question pertaining to other sexual conduct of any witness, the court would need to hold a hearing.

¶ 4. At the February 1997 trial, the State called Tyfonia's mother, Angie R., to testify. She testified that Tyfonia said that Williams put his finger in her vagina while they were in an elevator. On cross-examination, Angie stated that it was her boyfriend, Thomas White, who first told her that something was wrong with Tyfonia. She further testified that she left Tyfonia in the care of White. Williams' counsel then asked Angie whether she knew that White had sexually molested two older children in the past. The State immediately objected to this question.

¶ 5. Outside of the jury's presence, the court questioned Williams' counsel about the factual basis for his question and the reason he did not bring the issue to the court's attention before trial. Williams' counsel indicated that the reason he did not raise the issue prior to trial was that it did not concern the sexual knowledge or experience of the victim. In other words, it was not a

767

"rape shield" issue. He stated that it was the defense's contention that "if the child was assaulted, it was by Thomas White."

¶ 6. The State moved for, and the court granted, a mistrial. The court reasoned that the allegations involving White were dissimilar to the charges at issue in the matter at hand because White's two alleged victims were teenagers and Tyfonia was a child at the time of the alleged crime. The court further explained that defense counsel did not have a firm factual basis to support the defense's assertion not only that White, and not Williams, was the assailant in the Tyfonia case, but also that White had sexually molested the two other girls. For these reasons, the court stated that it did not think it could "somehow inform[ ] the jury" so as to correct the harm done and thus it had no other alternative but to grant a mistrial. Subsequently, Williams moved to dismiss the information based on the mistrial, arguing that the court erred in granting a mistrial. In denying the motion, the court stated that Williams' counsel's question of Angie had been provocative, prejudicial, immaterial and incendiary. The court stated that it had not seen any reasonable alternative to declaring a mistrial and denied the motion to dismiss.

¶ 7. Another trial commenced in July 1997, the jury found Williams guilty, and the court sentenced him to a forty-year prison sentence. Following his conviction, Williams moved for a new trial on the grounds of ineffective assistance of counsel. The trial court found that his counsel performed deficiently and ordered a new trial. The State appealed, but after remanding for a factfinding hearing, we dismissed the appeal on August 11, 1999, because the State failed to establish that its filing of the appeal was timely.

¶ 8. On October 27, 1999, Williams demanded a speedy trial in the third Tyfonia case. On October 28, he filed a written demand. The court set January 4, 2000, as the jury trial date. At a hearing on December 15, 1999, the prosecutor informed the court that he was trying to get the victim, Tyfonia, up from Chicago. He was not sure that the January 4, 2000 trial date would be possible.

¶ 9. On January 4, the State moved for a continuance, stating that it had to comply with the victim notification law and was unable to proceed. Williams moved for dismissal due to a speedy trial violation. The court denied the motion, citing the State's difficulty securing the victim's presence as sufficient grounds for adjournment. Pursuant to WIS. STAT. § 971.10, the court authorized Williams' release on bail. The parties agreed on March 15, 2000, as the jury trial date.

¶ 10. On March 15, 2000, the State again asked for an adjournment on the grounds that the victim had moved to Chicago and the State had been unable to reach her. Williams moved to dismiss, stating he was ready to proceed and the "speedy trial demand long expired." The court granted the State's request for an adjournment. The trial was set for June 14.

¶ 11. On May 9, Williams requested an adjournment of the June 14 trial date. He had retained new counsel and his new attorney had not yet received Williams' file from Williams' previous counsel. The jury trial was then set for July 10, 2000.

¶ 12. On July 10, the State asked for an adjournment because of problems with arranging travel for its other acts witnesses, Annitra and Okima, who had to fly in from Texas. The court summarized for the record an unrecorded discussion: The prosecutor had told Williams that if he insisted on going to trial, the State

would charge him with the 1990 incidents. Williams personally opposed the adjournment, but his attorneys believed it to be in his best interest. The court granted the State's request for an adjournment, stating "there has been no absence of diligence by either party that fair cause for adjournment has been shown and that I am going to grant the request for adjournment."

¶ 13. On July 20, the State filed additional charges for the 1990 incidents. At a hearing on August 28, the parties discussed consolidating the two cases for trial. Williams requested that the trial not take place before October because of additional investigation necessitated by the new charges. The trial was scheduled for November 13.

¶ 14. Subsequently, the State charged Williams with two counts of bail jumping for being outside the authorized area for a short time on two days in September 2000. As a result of the bail jumping charges, Williams was returned to custody.

¶ 15. On November 13, the trial was adjourned with Williams' consent. The case was rescheduled for February 5, 2001. However, the case once again had to be adjourned because Williams' counsel was concerned that he would still be involved in another jury trial on that date. At this time, Williams once again raised the speedy trial concern.

¶ 16. As it turned out, Williams' attorney was available the week of February 5 and a hearing was held on February 6, but because the Court had another commitment that day, the sexual assault case could not proceed. The court then set March 26 as the trial date, and April 19 as the backup date.

¶ 17. While the parties could not try the sexual assault trial on February 6, there was time for the bail

jumping case. The jury acquitted Williams of bail jumping. After thoroughly reviewing the record, the court did not release Williams.

¶ 18. When the March 26 trial date arrived, Williams' counsel asked for a day to talk to him. The following day, Williams' counsel informed the court that he was still trying to obtain the juvenile court records of Annitra and Okima. Williams' counsel had filed a motion to obtain the juvenile court records of the two girls. The court responded that Williams' counsel's motion was set for hearing "well in advance of the trial" but was taken off the schedule. The court stated that it was responsible for the delay. When the court mentioned starting the trial on April 23, Williams' counsel said he had a jury trial in another court. The prosecutor said that since Annitra and Okima had come from Texas, they were missing school and did not want to come back in April and miss school again. The parties agreed to use April 23 as a status date and the trial was scheduled for June 18. The court asked Williams if this is what he wanted to do and he replied that it was.

¶ 19. On June 14, Williams moved to dismiss the complaint charging him with the 1990 sexual assaults as vindictive prosecution. The court denied the motion at a June 14 hearing. The court explained that the present prosecutor had evidence available to him that the earlier prosecutor did not: the victim's testimony at the first trial in the 1996 sexual assault case. According to the court, that testimony provided an adequate explanation for the prosecutor's charging decision.

¶ 20. On June 15, the State requested another continuance because two key witnesses were unavailable. Although Williams' attorney stated that one of the witnesses was "of critical importance" to the defense,

Williams himself objected to the continuance, stating that his trial had been adjourned three times. The court stated it recognized Williams' objection, but did not want justice to miscarry and adjourned the trial until July 16.

¶ 21. The third trial commenced July 16. This trial ended in a mistrial without defense objection. The fourth trial commenced the following day. The jury convicted Williams on the sexual assault counts. Williams filed a postconviction motion for a new trial, raising many of the same arguments he does here. The trial court denied the motion on all grounds but one[2] and this appeal follows.

## DOUBLE JEOPARDY CLAIM

¶ 22. We begin by addressing Williams' double jeopardy claim. He submits that the trial court failed to exercise "sound discretion" in declaring a mistrial after his counsel had asked a State witness, the victim's mother, whether she was aware that White, whom the witness had identified as a caretaker of the victim, "had sexually molested two children in the past."

¶ 23. The Fifth Amendment to the U.S. Constitution and Article I, Section 8 of the Wisconsin Constitution protect a criminal defendant from being placed in jeopardy twice for the same offense. The underlying

---

[2] In his postconviction motion, Williams argued that his sentence was in excess of the legal maximum, his double jeopardy rights had been violated, the sexual assault charges concerning the 1990 incidents were the product of prosecutorial vindictiveness, his due process rights were violated, and he had been denied his right to a speedy trial. The trial court denied the motion on all grounds except for the illegal sentence.

purpose for this protection against double jeopardy is to prevent the State from using its resources and power to make repeated attempts to convict a person for the same offense. *State v. Seefeldt*, 2003 WI 47, ¶ 15, 261 Wis. 2d 383, 661 N.W.2d 822. "Jeopardy" means exposure to the risk of determination of guilt. *State v. Comstock*, 168 Wis. 2d 915, 937, 485 N.W.2d 354 (1992). It attaches in a jury trial when the selection of the jury has been completed and the jury is sworn. *Id.* Accordingly, the protection against double jeopardy includes a defendant's "valued right to have his trial completed by a particular tribunal." *Seefeldt*, 261 Wis. 2d 383, ¶ 16 (citation omitted).

¶ 24. A defendant's right to have his or her trial concluded by a particular tribunal can be, under certain circumstances, subordinated to the public interest in affording the State one full and fair opportunity to present its evidence to an impartial jury. *Id.*, ¶ 19. Nevertheless, given the importance of the constitutional protection against double jeopardy, the State bears the burden of demonstrating a "manifest necessity" for any mistrial ordered over the objection of the defendant. *Id.* If a trial is terminated without manifest necessity and over the defendant's objection, the State is not permitted to commence a second trial against the defendant. *Id.* "Manifest necessity" means a "high degree" of necessity. *Id.*

¶ 25. Before reviewing the record to analyze whether the State satisfied its burden to demonstrate "manifest necessity," we must first address the level of deference that attends a trial court's mistrial order. In discussing the appropriate level of deference to apply in reviewing a mistrial order, the United States Supreme Court in *Arizona v. Washington*, 434 U.S. 497, 508

(1978), described "two ends of the spectrum of deference." *Seefeldt*, 261 Wis. 2d 383, ¶ 25. At one end are those cases in which the basis for the mistrial is the unavailability of critical prosecution evidence or there is reason to believe that the prosecutor is using the State's superior resources to harass the defendant or to achieve a tactical advantage. *Id.*; *Washington*, 434 U.S. at 508. In such cases, an appellate court applies the strictest scrutiny to a trial judge's mistrial order. *Seefeldt*, 261 Wis. 2d 383, ¶ 25; *Washington*, 434 U.S. at 508.

¶ 26. At the other end of the spectrum are cases in which the basis for the mistrial is the trial judge's belief that the jury is unable to reach a verdict. *Seefeldt*, 261 Wis. 2d 383, ¶ 26; *Washington*, 434 U.S. at 509. Often in such cases, the jury has been unable to reach a verdict after protracted and exhausting deliberations. *Seefeldt*, 261 Wis. 2d 383, ¶ 26; *see also Washington*, 434 U.S. at 509. Great deference is accorded to a trial court's exercise of discretion because the trial judge is best able to assess the risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. *Seefeldt*, 261 Wis. 2d 383, ¶ 26; *Washington*, 434 U.S. at 509–10.

¶ 27. Having described the two ends of the spectrum, the *Washington* court addressed the case before it. There, the trial court had ordered a mistrial because the defense counsel had made improper comments during his opening statement. *Washington*, 434 U.S. at 499, 510. The Court concluded that "the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the

impartiality of one or more jurors may have been affected by the improper comment." *Id.* at 511. The Court reasoned:

> Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases. The interest in orderly, impartial procedure would be impaired if he [or she] were deterred from exercising that power by a concern that any time a reviewing court disagreed with his [or her] assessment of the trial situation a retrial would automatically be barred. The adoption of a stringent standard of appellate review in this area, therefore, would seriously impede the trial judge in the proper performance of [his or her] "duty, in order to protect the integrity of the trial, to take prompt and affirmative action to stop . . . professional misconduct."

> There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. [The trial judge] has seen and heard the jurors during their voir dire examination. He [or she] is the judge most familiar with the evidence and the background of the case on trial. He [or she] has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he [or she] is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.

*Id.* at 513–14 (citations and footnote omitted).

¶ 28. The circumstances in this case are akin to those in *Washington*. Here, the trial court ordered a mistrial after Williams' counsel asked what it believed to be an improper question of a witness. We can discern no distinction between conveying the possibly prejudicial information via an opening statement and convey-

ing it via a question of a witness on cross-examination. The same risk of jury bias attends. As *Washington* teaches, the trial judge is in the best position to evaluate the significance of that risk and must be given the discretion to determine what actions need to be taken to necessarily remove the risk of bias that may be created by the prejudicial information. We therefore conclude that the trial judge's decision to declare a mistrial based on his or her assessment of the prejudicial impact of the improper question is entitled to great deference.

¶ 29. As we recognized earlier, a determination that the trial judge's mistrial order is entitled to great deference does not end the inquiry. *Seefeldt*, 261 Wis. 2d 383, ¶ 35. More is needed. Considering the double jeopardy interests, the reviewing court must still satisfy itself that the trial judge exercised "sound discretion" in concluding that the State satisfied its burden of showing a "manifest necessity" for the mistrial. *Id.*

> Sound discretion means acting in a rational and responsible manner. Sound discretion includes, without limitation, acting in a deliberate manner taking sufficient time in responding to a prosecutor's request for a mistrial. It requires giving both parties a full opportunity to explain their positions and considering alternatives such as a curative instruction or sanctioning counsel. Sound discretion is not exercised when the circuit court fails to consider the facts of record under the relevant law, bases its conclusion on an error of law or does not reason its way to a rational conclusion.

> Sound discretion also requires that the trial judge ensure that the record reflects there is an adequate basis for a finding of manifest necessity. As such, sound discretion is more than a review to ensure the absence of a mistake of law or fact. Rather, a review for sound

776

discretion encompasses an assurance that an adequate basis for the finding of manifest necessity is on the record.

*Id.*, ¶¶ 36–37.

■

¶ 30. Thus, if a trial judge acts irrationally or irresponsibly, his or her action cannot be condoned. *Washington*, 434 U.S. at 514. However, our review of this record indicates that this was not such a case. First, Williams' counsel aired improper and highly prejudicial evidence before the jury. Williams' counsel was ordered to raise the question of admissibility before asking "a question pertaining to other sexual conduct of any witness" and he failed to do so. As pointed out by the trial judge, the alleged molestation of the other children, who were much older than the victim in this case, was irrelevant to who sexually assaulted the victim and that mention of the alleged molestation was highly prejudicial to the State. Furthermore, and most importantly, after questioning defense counsel about the factual basis for the alleged molestation, the trial court concluded that there was no "firm basis" for it. The posing of questions asserting the existence of facts for which there is no evidentiary basis constitutes behavior that courts cannot condone. *See Kiner v. State*, 643 N.E.2d 950, 954 (Ind. Ct. App. 1995); *United States v. Harris*, 542 F.2d 1283, 1307 (1976), *cert. denied, Clay v. United States*, 430 U.S. 934 (1977) ("It is improper conduct for the Government to ask a question which implies a factual predicate which the examiner knows [he or she] cannot support by evidence or for which [he or she] has no reason to believe that there is a foundation of truth.")

¶ 31. Second, the trial judge did not act precipitately in response to the prosecutor's request for a mistrial. Rather, the trial judge gave both Williams' counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial. The judge entertained Williams' suggestion that the court "try to save the trial" but rejected it stating that "the State has been very seriously harmed. And I don't know any alternative but declare a mistrial."[3] The record, therefore, persuades us that the trial judge acted responsibly and deliberately and accorded careful consideration to Williams' interest in having the trial concluded in a single proceeding. Since the trial judge exercised "sound discretion" in handling the sensitive problem of possible juror bias created by the improper question by Williams' counsel, the mistrial order is supported by the "high degree" of necessity that is required in a case of this kind. *See Washington*, 434 U.S. at 516.

## SPEEDY TRIAL CLAIM

¶ 32. We next turn to Williams' contention that the two-year and eleven-month delay violated his right to a speedy trial. The determination of whether there has been a denial of a speedy trial involves a four-factor balancing test, in which the conduct of both the pros-

---

[3] Williams likens this case to *State v. Collier*, 220 Wis. 2d 825, 838–39, 584 N.W.2d 689 (Ct. App. 1998), in which we held that the court failed to exercise sound discretion where the court did not consider the possibility of an alternative measure to a mistrial. However, unlike the trial court in *Collier*, the trial court here considered other alternatives before making its final determination. We, therefore, reject Williams' argument that this case compels the same result as *Collier*.

ecution and the defendant are weighed. The controlling factors the court must consider are: the length of the delay, the reason for the delay, the defendant's assertion of his or her right, and the prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). When we review a defendant's claim that he or she has been denied his or her constitutional right to a speedy trial, we accept the trial court's findings of historical fact unless they are clearly erroneous. *State v. Borhegyi*, 222 Wis. 2d 506, 508–09, 588 N.W.2d 89 (Ct. App. 1998). However, the application of the constitutional standards and principles to those facts presents a question of law, which we review de novo. *Id.*

¶ 33. The length of delay "is to some extent a triggering mechanism." *Barker*, 407 U.S. at 530. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* In the instant case, the period of time that elapsed from the August 11, 1999 dismissal of the State's appeal from the trial court's grant of a new trial to the date of the trial was approximately two years and eleven months. As the State concedes, the length of this delay necessitates that we examine the reasons for the delay.

¶ 34. In determining the reasons for a delay, an initial inquiry is, who caused the delay? *Norwood v. State*, 74 Wis. 2d 343, 354, 246 N.W.2d 801 (1976). If the delay can be attributed to the actions of the defendant, he or she cannot be heard to claim that that period of time be considered in deciding whether he or she has been denied a speedy trial. *Id.* If the delay can be attributed to the State, then the State must justify the delay. *Id.* To be a valid reason for delay, it must be a

779

delay that is intrinsic to the case itself. *Id.* If the State cannot justify the delay, then that period must be considered in deciding the issue of lack of a speedy trial. *Id.*

¶ 35. Williams contends that the length of the delay attributable to the State is twelve and one-half months: August 11, 1999 to October 27, 1999 (two and one-half months); January 4, 2000 to May 9, 2000 (four months); July 10, 2000 to November 13, 2000 (four months); March 26, 2001 to April 23, 2001 (one month); June 15, 2001 to July 16, 2001 (one month). Williams contends that the twelve and one-half month delay is "unacceptable."

¶ 36. The State cannot be fairly charged with the first period, from August 11, 1999, when this court dismissed the State's appeal from the trial court's granting of a new trial, until the first hearing in October 27, 1999, where the court set the trial date for January 4, 2000. We did not remit the case to the trial court until September 15, 1999, and the trial court lacked jurisdiction over the case until it received the remittitur and the record. *See State v. Neutz*, 73 Wis. 2d 520, 522, 243 N.W.2d 506 (1976) (determining that the trial court has no jurisdiction to act until it receives the remittitur in this case). Thus, the period from August 11 to September 15 is time consumed by the appeal, which, Williams concedes, should not be charged to the State. The remaining time can reasonably be attributed to the ordinary demands of the judicial system and is therefore neither chargeable to the State nor Williams. *See Norwood*, 74 Wis. 2d at 354 (noting that the time between the information and arraignment can be attributed "to the ordinary demands of the judicial system"). However, even if the month between remittitur

and the first hearing is charged to the State, it does not alter the outcome of our speedy trial determination.

¶ 37. The second delay, from January 4, 2000, until May 9, was occasioned by the State's inability to make contact with the victim in the case because she had moved to Chicago. At the hearing held on January 4, the prosecutor described his attempts to find the victim, and the trial court concluded that the prosecutor had exercised "reasonable diligence" in attempting to locate the victim and, therefore, granted an adjournment. A missing witness, here the victim herself, presents a valid reason for a delay that does not weigh against the State. *See Scarbrough v. State*, 76 Wis. 2d 87, 96, 250 N.W.2d 354 (1977) ("To be given no weight is 'a valid reason, such as a missing witness' which serves 'to justify appropriate delay.' ").

¶ 38. The third delay, from July 10, 2000, until November 13, 2000, was caused by the State's inability to secure the presence of the "other acts" witnesses it wanted to present at Williams' trial. After being informed by Williams' counsel that an adjournment would also "be in [Williams'] best interest," the trial court concluded that "since there has been no absence of diligence by either party that fair cause for adjournment has been shown . . . I am going to grant the request for adjournment."[4] Here, again, the missing

---

[4] We recognize that at the July 10 hearing, Williams made clear that he personally opposed the adjournment. Williams, however, had retained counsel, and his attorney's decision in this instance not to oppose the adjournment is one of those "tactical" decisions regarding trial strategy that "counsel is entrusted with the authority to make." *See, generally, State v. Gordon*, 2003 WI 69, ¶ 21, 262 Wis. 2d 380, 663 N.W.2d 765. Williams "is deemed bound by the acts of his [or her] lawyer-agent." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (citation

witnesses provide the State with a valid reason for the adjournment. *See Scarbrough,* 76 Wis. 2d at 96.

¶ 39. The next portion of the twelve and one-half month delay cited by Williams is the period from March 26, 2001, the scheduled trial date, until April 23, 2001, the status hearing date, and then again until June 15, 2001. As Williams recognizes in his brief, the trial court took responsibility for this period of delay because it had taken Williams' motion for access to the records off its calendar. As the State acknowledges, the State is charged with this type of "institutional delay." *See Hadley v. State,* 66 Wis. 2d 350, 368, 225 N.W.2d 461 (1975).

¶ 40. The final delay at issue, from June 15, 2001, until July 16, 2001, was occasioned by the unavailability of two witnesses, one of whom both parties considered important, if not critical, to their cases. As a consequence, both parties agreed to the adjournment. While it may be true, as Williams asserts, that the State could have been more diligent in securing the presence of one of the witnesses, the other witness was scheduled to undergo nonelective surgery. As the prosecutor explained, the witness "was very conscious of the court date and if he didn't have to undergo surgery, he wouldn't or the officer wouldn't otherwise do it unless there was some type of urgency." Thus, as with the other two adjournments, the unavailability of the wit-

omitted). Furthermore, regardless of Williams' desire to hold the trial, the State presented a valid justification for its need for an adjournment.

nesses constituted a "valid reason" for the adjournment.[5] *See Scarbrough*, 76 Wis. 2d at 96.

¶ 41. Summing up the periods of delay at the maximum and under the most favorable considerations to Williams, at most four months could be considered as delay attributed to the State for the purpose of determining the merits of Williams' assertion of his speedy trial right. Furthermore, during the two years and eleven months between the dismissal of the State's appeal and the commencement of the July 2001 trial, Williams himself acted inconsistently with his assertion of the speedy trial right by either affirmatively requesting or acquiescing in a delay in the commencement of the trial. These requests for, and consents to, the adjournments significantly diminish the weight of his demand for a speedy trial. *See U.S. v. Sarvis*, 523 F.2d 1177, 1182 (D.C. Cir. 1975) (stating that it is important to consider whether the defendant "uniformly pressed for the earliest possible trial date"). Under the facts of this case, therefore, the length of the delay does not constitute a delay which is prejudicial. *See Norwood*, 74 Wis. 2d at 358. Hence, there is no necessity for inquiring into the other factors that go into the balancing test. *See id.*

## PROSECUTORIAL VINDICTIVENESS CLAIM

¶ 42. We now turn to Williams' final claim. He contends that the judgment of conviction for the sexual assault charges concerning the 1990 incidents should

---

[5] Once again, we acknowledge that Williams personally objected to any further delay. However, as we pointed out earlier, Williams had counsel representing him and is bound by his counsel's acts.

be vacated and the complaint dismissed because those charges were the product of prosecutorial vindictiveness. As indicated earlier, the charges regarding the 1990 incidents were filed after Williams appealed his conviction for the 1996 sexual assault charges and obtained a new trial. Williams maintains that this circumstance gives rise to a presumption of prosecutorial vindictiveness that the State was unable to overcome.

¶ 43. To establish a claim of prosecutorial vindictiveness, a defendant must show either a "realistic likelihood of vindictiveness," therefore raising a rebuttable presumption of vindictiveness, or actual vindictiveness. *State v. Johnson*, 2000 WI 12, 17, 232 Wis. 2d 679, 605 N.W.2d 846. To establish actual vindictiveness, "there must be objective evidence that a prosecutor acted in order to punish the defendant for standing on his [or her] legal rights." *Id.*, 47 (quoted source omitted). "The legal principles surrounding prosecutorial vindictiveness claims present questions of law that we review de novo." *Id.*, 18. The trial court's findings of fact regarding whether a defendant established actual vindictiveness is reviewed under the clearly erroneous standard. *Id.*

¶ 44. The United States Supreme Court has found a presumption of prosecutorial vindictiveness to exist in two cases: *Blackledge v. Perry*, 417 U.S. 21, 27–28 (1974), and *Thigpen v. Roberts*, 468 U.S. 27, 30–31 (1984). We have found such a presumption to exist in one case: *State v. Edwardsen*, 146 Wis. 2d 198, 203–04, 430 N.W.2d 604 (Ct. App. 1988). *Blackledge, Thigpen* and *Edwardsen* all involved situations in which a criminal defendant had pursued postconviction relief from an initial conviction that resulted in his

obtaining a new trial, and the prosecutor had then either increased the charge on which the defendant had originally been tried or added charges to that original charge.[6] However, contrary to Williams' assertions, all three cases are readily distinguishable from this case.

¶ 45. In all three cases, the increased charge or added charges arose out of the same criminal course of conduct that had been the subject of the original charge. *Blackledge*, 417 U.S. at 23 (the new indictment "covered the same conduct"); *Thigpen*, 468 U.S. at 30–31 (the felony charge "covered the same conduct"); *Edwardsen*, 146 Wis. 2d at 203 n.1 (describing the case before it as "one where the new charges were added stemming from the same spree of activity as the original charges"). Here, by contrast, the new charges related to a completely separate and distinct criminal episode, involving separate and distinct victims, that had occurred six years earlier. The Eleventh Circuit has recognized this distinction as being a critical one,

---

[6] Both indictments in *Thigpen* arose from the same drunk driving incident. In the original indictment, the defendant was charged with four misdemeanors. *Thigpen v. Roberts*, 468 U.S. 27, 28 (1984). In the second indictment, the defendant was charged with felony manslaughter. *Id.* at 30–31. In *Blackledge v. Perry*, 417 U.S. 21, 22–23 (1974), the original charge was a misdemeanor charge of assault with a deadly weapon. The subsequent charge, based on same incident, was a felony charge of assault with a deadly weapon with intent to kill and inflict serious bodily injury. *Id.* In *State v. Edwardsen*, 146 Wis. 2d 198, 200, 430 N.W.2d 604 (Ct. App. 1988), the defendant was originally charged with possession of cocaine with the intent to deliver and battery to a police officer. Following the defendant's successful appeal of the possession and battery charges, the State added an "attempt to disarm a peace officer" charge, which was based on the same incident. *Id.*

rendering inoperative the presumption of prosecutorial vindictiveness recognized in *Blackledge* and *Thigpen*:

> In [*Thigpen*], the Supreme Court reiterated that where a defendant is indicted on more serious charges while pursuing appellate or collateral relief on original charges, a presumption of prosecutorial vindictiveness, in violation of Fifth Amendment due process, arises. The Court in *Thigpen* affirmed the ruling of the Fifth Circuit that the defendant was entitled to habeas corpus relief.
>
> Both *Thigpen* and *Blackledge* are distinguishable from the facts before the court. First, both of the cases reviewed by the Supreme Court involved defendants who were originally charged with misdemeanors and, pending appeal of the misdemeanor convictions, were charged with felonies. Second, the offense charged in the second indictment in *Thigpen* arose out of the identical occurrence that gave rise to the original indictment. Likewise, in *Blackledge* the second indictment was based on the same incident as the original indictment.
>
> In *Blackledge* the Court addresses the situation of state retaliation by *substituting* a more serious charge for the original charge. Clearly that is not the situation in this action. Appellant has not faced stiffer charges arising out of one single incident. The charges in the second indictment are not a substitution; indeed, they are different charges based upon independent acts. Although the timing of the second indictment suggests that *Blackledge* and *Thigpen* are applicable, they are not.

*Humphrey v. United States*, 888 F.2d 1546, 1549 (11th Cir. 1989) (citations and footnotes omitted). As *Humphrey* suggests, the fact that a defendant is facing stiffer charges arising out of a single incident is important because where such is the case, the concern is that the

786

defendant will be discouraged from exercising his or her right to appeal because he or she is afraid the State will retaliate by substituting a more serious charge for the original one on retrial. However, this concern does not come into play where the new charges stem from a separate incident. In that situation, it is not the appeal that opens the door for the second charge. The prosecutor could have brought the charges against the defendant at any time, regardless of whether the defendant chose to appeal his or her conviction in the original case.

¶ 46. Furthermore, in this case, the present prosecutor had new evidence available to him that the earlier prosecutor did not—the testimony of the two alleged victims from the first trial. Williams argues that the present prosecutor had no more information than did the original prosecutor in the case, when the present prosecutor decided to proceed with the charges concerning the 1990 incidents. Williams points out that the first prosecutor made his decision not to press charges in the 1990 incident based upon a paper record —the victims' statements in a police incident report, and the present prosecutor similarly relied on a paper record to make his determination to proceed against Williams—the transcript of the victims' testimony at the first trial. Williams, however, misses the point.

¶ 47. Contrary to Williams' assertions, the fact that the present prosecutor made his decision to press charges without actually seeing the witnesses testify is not relevant. A victim's statement in an incident report is an entirely different matter than a victim's testimony given at trial. In the latter case, the victim's statements are given under oath and are subject to cross-examination through which the victim's credibility is

tested. Thus, even though he was not personally in the courtroom when the witnesses testified as "other acts" witnesses, the charging prosecutor had an opportunity which the first prosecutor did not have—that being, to review the witnesses' testimony when given under oath and subjected to both direct examination and vigorous cross-examination. Armed with the knowledge that the witnesses were credible and their testimony could withstand cross-examination, the charging prosecutor felt he could prove the case. Thus, the new charges simply represent "a different approach by a new prosecutor" based on new information. *See Crozier v. State*, 882 P.2d 1230, 1233 (Wyo. 1994) ("The proscription of the rule against vindictive prosecution is not invoked if substantial evidence demonstrates the prosecutor acted in good faith and for independent reasons or due to intervening circumstances. Those justifications can include . . . a different approach by a new prosecutor."). Under such circumstances, we cannot say that "a realistic likelihood of 'vindictiveness' " exists so as to trigger the *Blackledge* presumption. *See Johnson*, 232 Wis. 2d 679, ¶ 17.

¶ 48. Williams also asserts that the presumption of vindictiveness arises in this case because in July 2000, prior to filing the new charges, the prosecutor informed Williams that if he insisted on going to trial, the State would charge him with the 1990 incidents. It is well established that this conduct does not give rise to a presumption of prosecutorial vindictiveness. *Bordenkircher v. Hayes*, 434 U.S. 357, 358–59, 364–65 (1978) (holding that the prosecutor's conduct did not violate the defendant's due process rights where the prosecutor carried out an explicit threat to file more serious charges against the defendant if the defendant refused to plead guilty to a less serious offense). Accordingly, we

hold that the presumption of prosecutorial vindictiveness does not come into play in this case.

¶ 49. Because we determine that the presumption of prosecutorial vindictiveness is inapplicable, Williams must establish actual vindictiveness for his claim of prosecutorial vindictiveness to succeed. Williams does not argue that the second charges were the product of actual vindictiveness and we can find no evidence in the record suggesting that the prosecutor brought the new charges to punish Williams for appealing his first conviction. Thus, like his other challenges to the judgments of conviction and the postconviction orders, Williams' claim of prosecutorial vindictiveness fails.

*By the Court.*—Judgments and order affirmed.